JAMES GALLOWAY, JUNIOR, APPELLANT v. HENRY R. FINLEY AND
DAVID BARR, APPELLEES.

C. B., a man resident in Ohio, as an officer in the Virginia line, during the revolutionary war, was entitled to a quantity of military land in the state of Ohio. Warrants for the land were issued to him, and were surveyed, located, and patented. In 1835, the heirs of C. B. sold part of these lands to G., who went into possession of them. He soon afterwards discovered that the patent for these lands issued after the decease of C. B., and was consequently void. The land had been recognised for forty years, as the property of C. B. and his heirs, and the title in them deemed valid. G., on making a discovery of the defects in the patent, entered and located the land for himself. *Held,* that G. could not be permitted to avail himself of this defect in the title, while standing in the relation of a purchaser, to defeat the agreement to purchase made with the heirs of C. B. Under the most favourable circumstances, he could only have it reformed; and the amount advanced to perfect the title, deducted from the unpaid purchase money. Where the purchaser, instead of claiming from his vendors the cost of entering and surveying the lands, the defect in the title to which had become known to him through his purchase, claims to hold the land as his own, under the title acquired by his entry and survey; and asks a court of equity to rescind the contract of purchase; a court of equity will decline giving him its aid to obtain the expenses of the warrants and surveys taken out by him for the land, and set up against the rights of his vendors.

It is an established rule in equity, that when the vendor of land has not the power to make a title, the vendee may, before the time of performance, enjoin the payment of the purchase money, until the ability to comply with the agreement is shown; but then the court will give a reasonable time to procure the title, if it appears probable that it may be procured.

In reforming a contract for the sale of lands, equity treats the purchaser as a trustee for the vendor, because he holds under the vendor; and acts done to benefit the title by the vendor, when in possession of the lands, enure to the benefit of him under whom the possession was obtained, and through whom the knowledge that a defect in the title existed was derived. The vendor and vendee shared in the relation of landlord and tenant; the vendee cannot disavow the vendor's title.

A patent for lands issued after the decease of the patentee, passes no title to the lands; there must be a grantee before the grant can take effect.

The acts of congress of 1807, and the subsequent acts relative to the titles to military lands, were intended to remedy any defects in the patenting the lands in the name of the warrantee, who might have been deceased at the time of the emanation of the patent; and to secure the title to the lands to the heirs of the patentee. The statute is general, including by name all grants, not distinguishing between void and valid; and the plainest rules of propriety and justice, require that the courts should not introduce an exception, the legislature having made none.

APPEAL from the circuit court of the United States, for the western district of Pennsylvania, in the third circuit:

[Galloway v. Finley et al.]

The appellant filed his bill on the 19th of October, 1835, stating, that on the 11th of March, 1835, he entered into an article of agreement with David Barr, acting as attorney for his wife, Elizabeth Julia Ann, who thereby became a party to the same. The agreement stated that Charles Bradford, late of Pennsylvania, obtained for his services as an officer in the Virginia continental line, a land warrant, No. 4467, for 2666 acres of land, which was entered, surveyed, and patented in three surveys in the Virginia military district, in Green and Brown counties, in the state of Ohio. That Charles Bradford died intestate, leaving four children, two of whom died without issue, and intestate, leaving Henry R. Finley, and Elizabeth Julia Ann, his only surviving heirs. Elizabeth Julia Ann married John Finley, and died, leaving two children, Henry, and Elizabeth Julia Ann, who are the only heirs of their mother, and are entitled to one undivided half of the said military land. That Henry R. Finley, and Elizabeth Julia Ann, the wife of David Barr, sold to the complainant an undivided moiety of the two surveys in Green county, in consideration of an agreement to pay eight thousand dollars; of which one thousand dollars was paid, and notes given to Henry R. Finley, and to the wife of David Barr, for the residue due, payable in equal instalments, in one, two, and three years; viz., on the first of January, 1837, 1838, 1839. The defendants, and the wife of Barr, covenanted that they were the persons they represented themselves to be, and that they were seised and possessed of a good legal title to the lands they sold to the complainant; and bound themselves, their heirs, &c., to make him, his heirs, &c., a good title in fee simple, as soon as he should pay the purchase money. That defendants asserted they had in possession the evidences of the title of defendant, Finley, and the wife of Barr, to the land; and that a letter of attorney had been executed and acknowledged by Barr's wife to himself, authorizing him to sell and convey her title in the land; that they had then just discovered that they had not brought these papers with them, and to induce appellant to close the contract, promised to send him the papers as soon as they should return home: confiding in the existence of the papers, and the promise to forward them to him, he concluded the agreement. The complainant says he paid down the one thousand dollars, and one hundred and four dollars; the latter credited on the last note. That since the date of the contract, Barr's wife has died intestate, and without issue, being a minor at her death. That defendants have not pro-

duced their title papers, nor letter of attorney. That defendants cannot perform their contract, nor make a good title to the land, because Charles Bradford died in 1789; and the lands were entered in his name, on the 19th of April, 1793; and the tract of one thousand acres was surveyed the 14th of February, 1794: and the survey of the tract of twelve hundred acres, was made the 24th of March, 1794: the entries and surveys being made about four years after his death.

The complainant, averring his readiness to perform, prays that the article of agreement may be deemed annulled and cancelled; that the money be refunded, with interest, and the notes enjoined, and the collection restrained; and for general relief.

The defendants, Finley and Barr, on the 19th of January, 1836, answered jointly, admitting the contract as stated in the bill, and that H. R. Finley, and Elizabeth Julia Ann Barr, wife of David Barr, were the children, and sole heirs of Elizabeth Julia Ann Finley, daughter of Charles Bradford, and entitled, as such, to a moiety of the lands in question; and that they told the appellant they had, in Pennsylvania, evidence that defendant, Finley, and the wife of defendant, Barr, were the heirs of Elizabeth Julia Ann Finley; all which they assert to be true, and can prove. The defendants deny that they represented they had in possession any title papers, or any evidence except that which would prove the heirship of defendants, Finley, and the wife of Barr. On the contrary, they told the complainant they had no title papers, and that they had only recently been informed of the existence of the land; and that the defendant, Finley, and the wife of Barr, had any title thereto. The complainant told defendants he had long known that the heirs of Elizabeth Julia Ann Finley were entitled to one undivided half of said lands; that he had a record of their names; had made inquiries for them: that he had been anxious to buy the interest of, defendant, Finley, in the lands; as he, the complainant, had sold the said lands, and bound himself to give good titles, and he feared some other person would purchase the interest of the defendant, Finley, and his sister, and give him trouble. The complainant stated at the time, that he knew all about the title; and that if defendant, Finley, and his sister, Elizabeth Julia Ann Barr, were the children of Mrs. Finley, he was satisfied as to their right to the lands. Defendants admit that they agreed to forward to appellant evidence that defendant, Finley, and his sister, were children of Mrs. Finley, and meant to do so; but the death of

[Galloway v. Finley et al.]

Mrs. Barr, caused it to be neglected. The defendant, Finley, denies representing to appellant that Mrs. Barr had executed a letter of attorney to her husband, and that defendants had only then discovered that it had been left behind: he admits that he might have told appellant that Mrs. Barr was willing that her husband should sell her interest. The defendant, Barr, admits he represented that his wife was willing he should sell her interest; and that a letter of attorney had been prepared to that effect, and left behind; but he denies recollection of saying it had been executed and acknowledged, and that he supposed he had the same with him, and had then only discovered he had left it behind. He admits he promised to forward the power, but the death of his wife prevented this being done.

The defendants deny intention or attempt to induce appellant to enter into contract, and pay his money thereon, by fraudulent representations. They admit the payment of one thousand dollars, and one hundred and four dollars, as stated in the bill; and that Mrs. Barr died a minor, without issue and intestate; but aver that her death did not affect their right to comply with the contract, as the interest of Mrs. Barr vested at her death in defendant, Finley; who has been, and is willing to fulfil it. They deny all fraud and combination, and aver and will prove, that they made the contract in perfect good faith, believing that defendant, Finley, and Mrs. Barr had a legal right to a moiety of the land: the knowledge of their right chiefly came from appellant. But they deny that at the time of making the contract, they had any knowledge of the date of the entry or survey, or of the date of C. Bradford's death: they allege, the first intimation they had that the land was entered and surveyed after his death, was derived from the bill. They admit, from information, &c. since the bill was filed, that they believe the said lands were entered and surveyed at the times mentioned in the bill, and since the death of Bradford; who died about the time mentioned in the bill. The defendant, Finley, avers, that as soon as he was apprized of the facts mentioned in the bill, as to the date of entry and survey, he made inquiries as to the facts, and being satisfied that they were true as alleged in the bill, he proceeded without delay to the surveyor's office in Chillicothe, to get information to take steps to procure an entry of said lands, that he might fulfil said contract; which he is ready and anxious to comply with. But he was surprised when he ascertained that the appellant, a few days before, on the 26th September, 1835, fraudulently, and as defendant alleges, for the purpose of putting it out of

the power of defendants to comply with their contract, and to defraud the defendant, Finley, out of his lands, had entered the same lands under surveys No. 2277 and No. 2278, mentioned in the agreement; as certified copies of the entries made by appellant, and made part of the answer, will prove.

The defendants aver, that the complainant, having made these entries to further his designs, immediately filed this bill without intimating objections to their title; although defendant, Finley, had met and conversed with him at Pittsburgh, after the entries were made, and before the bill was filed. The defendants allege, and will prove that the lands were duly entered, surveyed, and patented in the name of Charles Bradford, by virtue of which the defendant, Finley, and his said sister, at the date of contract were, as the heirs of Mrs. Finley, deceased, daughter of Charles Bradford, deceased, entitled equitably and justly to the undivided half of said lands, and had good right to sell and convey. By the death of Mrs. Barr, a minor, without issue, her right vested in the defendant, Finley, as sole surviving heir of Mrs. Finley; and being so entitled, he avers his power, readiness, and willingness to make a perfect title to the appellant for an undivided moiety of the lands, on the fulfilment of the contract by him. The defendants aver that any title which the appellant may have acquired by his entry of September 26th, 1835, shall be taken to enure to the benefit of them, for whom he holds the lands in trust for fulfilment of the agreement; and they pray that the bill may be dismissed, &c.

In February 13th, 1837, the appellant filed his amended bill, stating that besides the money he had paid defendants on account of the contract, he released to them his interest to an undivided half of survey No. 4456 for 466⅓ acres, for the consideration of five hundred dollars. That when he made the contract with the defendants, he believed that they had a perfect title to the lands they sold him; was ignorant that the entries, &c. had been made in the name of a man not in being; and that it was not for a considerable time afterwards he came to a knowledge that the land was vacant, and that the defendants had no power to make him a title, and that the lands were subject to entry by a holder of a Virginia military warrant. He had previously purchased an undivi ed half of the same lands, and paid a large consideration. Deeming it right to protect his interest in premises, on the 26th September, 1835, he caused entries No. 13,696 for 1208 acres, and No. 13,697 for 1000 acres, to be ma e; and on the same day caused surveys to be made and returned, which were

[Galloway v. Finley. et al.]

recorded 28th September, 1835.   He refers to attested copies filed with the answer.  The appellant charges the fact, that the lands being wholly vacant and unappropriated, he has invested himself with the best title to the same.

He prays that the defendants may answer, and also as in his original bill: or if it shall be found that defendants, or either of them, had a good title to the land, and still have a right to the same, and have authority to make a valid conveyance, then the appellant is ready, and tenders the full and perfect completion of the contract on his part.   And he prays for general relief.

A separate answer was made to the amended bill by David Barr; and filed February 25th, 1837.

He admits the deed of release of the appellant's interest in survey No. 4456, and that the consideration named in the deed was five hundred dollars; but denies that that sum was the true consideration, averring that one hundred and four dollars and thirteen cents, credited on one of the notes as mentioned in the original bill, was the true consideration.   The defendant avers, that at the time of making the contract, both defendants denied Galloway's claim to this survey, and set up the entire right to the same to be in Finley and his sister, then living; and that it was not considered nor formed any part of the contract; but after the contract was executed, Galloway urged a claim, at least for the taxes he had paid on the survey.   This defendant agreed, in consideration of the release, to refund the taxes paid by crediting the amount on the note.   The sum of five hundred dollars was inserted at the instance of Galloway, to induce his wife, as he said, to sign the deed.   The defendant, Finley, had nothing to do with this transaction.   As to appellant's *belief* that Finley and his sister had a good title, the defendant says that the complainant represented to them that he knew all about their title.   The defendant supposes that the appellant became acquainted with the facts that the entries and surveys had been made in the name of a dead man, after the date of the will of Bradford had been communicated to him.   He cannot admit that the appellant has by the entries, &c. in his own name, invested himself with the best and only title to the lands.   The defendant d... nies that the lands were vacant and unappropriated at the time appellant entered them; but they had before been appropriated under warrants of Bradford, under whose entry, &c. Finley and his sister had acquired a good title, and had good right to sell and convey the same.   He prays that the bill may be dismissed.

[Galloway v. Finley et al.]

The cause was tried on the 26th of May, 1837; and the court decreed that the bill of the complainant should be dismissed.

The complainant prosecuted an appeal to this Court.

The case was submitted to the Court on printed arguments, by Mr. Corwin and Mr. Mason for the appellant; and by Mr. Fetterman for the defendants.

For the appellant the following points were made:

1. Galloway was not obliged by any principle of law or equity, to put the defendants in a situation to comply with their contract. Therefore he was not bound to assist them in procuring a title where none existed before.

2. Nor could mere silence and non-interference be imputed to him as a delinquency, for which his rights under the contract might be injuriously affected.

3. But Galloway did interfere. For when he discovered that the defendants had no title whatever to the land they had sold him, and that it was vacant, and might be appropriated, at any moment, by the first warrant holder who should come to the knowledge of that fact; he entered it in his own name.

4. Was this act on the part of Galloway an interference inconsistent with any duty imposed on him by the relation of vendor and purchaser then existing between himself and defendants? Was it a breach of good faith towards them, that ought, on admitted principles, to deprive him of the aid of a court of equity?

5. It appears from the pleadings, that Galloway had purchased, prior to the date of his contract with the defendants, an undivided moiety of the land in controversy, which he had afterwards sold and bound himself to convey by a good title; that he was urgent in his solicitations to purchase the interest of the defendants, from an apprehension as he said of having trouble, should they sell to any other person. Hence, it is maintained, that complainant had, as he asserts in his amended bill, a "right to protect his own interest in the premises," by making the entries he did the 26th of September, 1835.

6. Galloway had no authority to re-locate the warrant of Bradford, either in his own name, or in that of the heirs of Bradford.

But if he had such authority he was not bound to exercise it, and could not have done so without first returning to the general land

[Galloway v. Finley et al.]

office the patent for cancellation; and then of incurring the risk of acquiring a doubtful title.

7. He could not have delayed to make the entries at the time he did, without the hazard of losing the whole land; which he had already twice purchased.

8. It was certainly lawful for Galloway to secure, in the mode he has attempted to do, the undivided half of these lands which he had long before purchased and conveyed away. To accomplish this object he was compelled to enter the whole, inasmuch as he could not enter an undivided part of the land.

9. Ought the acts of Galloway, in appropriating these tracts of land to himself, to enure to the benefit of the defendants? The parties were not tenants in common; because the entire interest, if any thing, was vested in Galloway. But neither party had any interest legal or equitable; and there can be no tenancy in common of a mere nonentity.

10. Unless Galloway was somehow disabled from doing what was lawful for all the world besides, he has undoubtedly acquired an equitable title to at least one undivided half of the lands. And as to the other moiety, he has an equity that ought to be protected; as the defendants, having no title themselves, can lose nothing by the acts of Galloway, unless it should be a chance or mere possibility.

11. In determining upon questions of title, mere possibilities are not regarded; the court must govern itself by moral certainty. When a considerable or rational doubt exists; notwithstanding the better opinion, in the judgment of the court is that a good title can be made; a court of equity will not compel a purchaser to take the title. 2 Hoven. on Frauds, 24, 25, and cases there cited.

12. Where the vendor has in reality no interest in the subject of the sale though he believed he had, the contract will be set aside. 2 Hoven. on Frauds, 13.

13. A decree may be obtained by a vendee to have a purchase contract delivered up, on the ground of the defective title of the vendor. 2 Hoven. on Frauds, 24.

14. It is very properly admitted in the argument on the other side, as the law undoubtedly is, that entries made in the name of dead men, are null and void. But it is insisted, at the same time, that such entries are protected by the proviso to the act of the 2d of March, 1807, as against all entries made subsequent to the passage

of that act. The contrary can be maintained both by reason and authority.

Mr. Corwin and Mr. Mason for the appellant.

The complainant has sought the aid of the Court in this case, to rescind a contract for the sale of real estate. The facts necessary to be considered are few, and in general admitted by the pleadings of the parties. The complainant alleges that he purchased of defendants the undivided moiety of 2200 acres of land lying in the Virginia military reservation, in Ohio; for which he was to pay about eight thousand dollars, in payments, the last of which would become due in 1839. That he paid one thousand dollars at the time of completing the purchase, on the 11th of March, 1835. That he also advanced at that time, the further sum of one hundred and four dollars, to enable the defendants to pay taxes due from them on other lands in Ohio. These facts are admitted by the answers of the defendants.

It is alleged by complainant, and admitted in the answers, and by the printed argument of defendants' counsel, that complainant had, previously to the date of his contract with defendants, purchased of one Finley Bradford, a co-heir with the defendants, the other moiety of the same land now in controversy. It is alleged by complainant and not denied by the defendants, that a controlling motive for entering into the contract of purchase with the defendants, arose out of the fact of his having sold parts of the land purchased of Finley Bradford, and bound himself to make titles under such sales to the purchasers. The complainant insists that at the time he purchased (March, 1835,) neither defendants of whom he purchased the last, nor Finley Bradford, their co-heir, of whom he purchased the first half of the 2200 acres of land, had any title thereto either in law or equity. That the land has been since appropriated by a valid entry and survey made in September, 1835, in another and better right; and thus he fairly comes before the court to ask a decree for the rescission of the contract; on the ground of a failure, or total want of consideration moving from the defendants to him.

Upon this state of facts, two general propositions are to be established:

1. That defendants had no title either in law or equity to the land sold by them to the complainant.

2. That the land had been fairly appropriated by another, under

[Galloway v. Finley et al.]

valid entry and surveys, so that defendants never can make a title for it.

The facts necessary to be known, in order to test the validity of the title under which the defendants claim, are all undisputed in the pleadings. The history of titles, in what is properly called the Virginia military district in the state of Ohio, is too well understood by the Court to justify its recital here. The territory between the Little Miami and Scioto rivers, in Ohio, was set apart by the state of Virginia, to satisfy military bounties granted by her for services rendered in the revolutionary war. By the terms of cession of the territory north-west of the river Ohio, when the warrants for these bounties should be satisfied, the remainder of the territory, (if any,) between the two rivers just mentioned, belonged to the United States; and became a part of the national domain. Charles Bradford, under whom defendants claim, it is admitted on all hands, held a warrant which authorized him to appropriate two thousand two hundred acres of land, in this territory. And the question arises, whether any land whatever has been appropriated by virtue of this warrant.

It is admitted that Charles Bradford, the owner of this warrant, died in Washington county, in the state of Pennsylvania, in the year 1789. The entries of the land, by virtue of the warrant in question, were made in the name of *Charles Bradford*, in 1793, and the surveys were executed in *his* name in 1794. It is also admitted, that a patent has issued in his name; but when, is not shown by the record. Thus it is shown, that the entries were made and the surveys executed four years after the death of the proprietor of the warrant, and in his name. Did these proceedings attach to the specific property now in controversy, any right in favour of defendants, which is valid either in law or equity? We do not feel ourselves at liberty to consider the proposition thus stated, as one open for discussion before this Court. It is only necessary to say here, that we consider it in all respects, as perfectly identical with the principle fully discussed and settled by this Court, in the case of Galt and others v. Galloway, 4 Peters, 332; and M'Donald v. Smalley and others, 6 Peters, 261.

It will be borne in mind by the Court, that although the property in question is situated within the limits and territorial jurisdiction of Ohio, and would, therefore, be subject, in the hands of individuals, to the legislation of that state, in all things affecting its transfer by deed or devise; yet as a part of the public domain, the mode of acquiring right to it, and separating it from the mass of public lands, is to be

prescribed by the laws of Virginia; and such regulations as the United States' government have, from time to time, since the cession of Virginia, thought proper to make concerning it.

If, however, the Court should suppose that the question of law under consideration, could in any degree be affected by the "lex loci rei sitæ," it will be found, that the highest judicial tribunal of Ohio has settled this question, in exact conformity to the law as laid down by this Court. In the case of Wallace's Lessee v. Saunders, 7 Ohio R. 179, the court, without a dissenting opinion from either of its four judges, declare, that an entry of Virginia military lands in Ohio, made in the name of an individual, not living at the time, is not merely defective, but that it is, as this Court have said, a mere nullity; that it leaves the land open to be taken up by any one holding a warrant, as though no attempt at appropriation had ever been made.

It is proper here to consider whether Bradford's entry, being void, as has been shown, is made valid by the act of congress, of the 2d of March, 1807, which has been continued in force, by various re-enactments, up to the 31st of March, 1832: which last is still in force.

The proviso in all these acts, which is supposed by defendants' counsel to protect the entry of Bradford, under which they claim, is in these words: "Provided that no locations as aforesaid, within the abovementioned tracts, shall, after the passage of this act, be made on tracts of land for which patents have been previously issued, or which had been previously surveyed; and every patent which may, nevertheless, be obtained for land located contrary to the provisions of this section, shall be considered as null and void." See 7th vol. U. S. Laws, 516; U. S. Laws, 8th vol. 531.

It is conceded by the defendants' counsel, that the proviso in question was intended to protect from interference "defective entries and patents;" and that this has been the uniform construction placed upon it by the courts of the country. We agree with this exposition of the law, and admit that if the entry and survey of Bradford were merely defective and not void, that they are protected by the act of congress, and the subsequent entry of Galloway is void. The case of Doddridge v. Thompson, 9 Wheat. 481, is an authority to show that the act in question was passed, as the Court there say, "to cure defects" in titles already acquired.

This Court has determined, that the proviso in the act of 1807 does not protect a survey against locations, where the entry on which

[Galloway v. Finley et al.]

such survey was made had been withdrawn. Taylor's Lessee v. Myers, 7 Wheat. 23. In the case of Lindsey v. Miller, 6 Peters, 666, the Court declare that void entries and void surveys are not protected by the proviso in question. In commenting on the case of Jackson v. Clark and others, reported in 1st Peters, 628, the Court say, that they "gave effect to the act of congress in that case," because the survey was not void, but merely defective. 6 Peters, 677.

If entries and surveys made in the name of dead men are void—are mere nullities, and leave the land upon which they are made open to subsequent location, as this Court has decided, in the case cited from 4 Peters, 332, and 6 Peters, 261; and as has been also decided in Ohio Rep. 7th vol. page 173, then it follows, that the act of congress relied upon by defendants, cannot protect the land in question, from the entry of Galloway made in September, 1835. We refer the Court here to the case in Ohio Rep. 7th vol. page 173, as an express authority upon this very point. The effect of the proviso, in the act of 1807, upon an entry in the name of one not in life at the time, is there considered, discussed and decided by the court. We consider that as settling the law of this case, so far as the proposition now under discussion affects it.

Having arrived, we hope satisfactorily, at the conclusion that Bradford's entry, being originally a nullity, left the land in question a part of the Virginia reservation, open to any holder of a warrant to locate; we come to consider whether it has been appropriated by another, in such manner as to withdraw it forever from the power of the defendants.

The entries and surveys of Galloway are set forth in the record, and admitted to be made on proper warrants, and by competent authority. Thus far it seems quite impossible to resist the conclusion, that the land in question was vacant land, up to September, 1835;, and if Galloway's entry is good for the purpose of appropriation at all, it remains to inquire whether such entry shall enure to his own, or another's benefit.

It is insisted by defendants' counsel, that the relation of vendor and vendee, which subsisted between complainant and defendants, created a trust which obliged Galloway, as trustee for defendants, to use the original warrant of defendants' ancestor, which by his death descended to his heirs, for the purpose of appropriating the two surveys in question. It will be admitted, we are sure, that on this branch of the case, it is incumbent on the defendants to show:

1st. That the contract between them and complainant, by necessary implication, devolved this duty on the latter.

2d. That in September, 1835, when it was discovered by both parties that the land in question was vacant, it was clearly in the power of Galloway to make at that time a valid legal entry, by virtue of the original warrant of Charles Bradford, deceased.

If either of these positions are doubtful, or clearly ascertained against the defendants, then the Court are left no alternative but to give full effect to Galloway's entry made in September, 1835, for his benefit.

On the first proposition, it becomes necessary to inquire, to what extent the vendee of real estate may be said to stand in the relation of trustee to his vendor. The rule we conceive to be laid down very accurately in Sugden's Vendors, page 162. It is there stated, that "equity considers the vendor as a trustee for the purchaser of the estate sold, and the purchaser as a trustee of the purchase money for the vendor." The same principle is in substance determined in Greer v. Smith, 1 Atkyns, 572, and in Pollifexen v. Moore, 3d Atkyns, 272. Thus it appears, that the mutual trusts imposed on vendor and vendee of real estate by courts of equity, are nothing more than the duty of performing, in good faith, the stipulations of their agreement. The vendor is charged with the duty of conveying, as he has agreed to do, the estate; and the vendee is, in equity, held bound to pay the purchase money, as he has agreed to do. Hence it follows, that complainant was not bound by any principle of equity to put the defendants in a situation to comply with their contract; he was not surely bound to assist them with money or services, to enable them to make a title to the land they had sold; he was not bound to inform them that the land was vacant, because the entry on their warrant, made in the name of, and after the death of Charles Bradford, was void. It cannot be pretended, that silence or inaction on his part, would deprive him of the aid of this Court, on the pretence that because he had said, or done nothing, he had therefore acted in bad faith towards the defendants. On the contrary, the law is, that the vendors (the defendants in this case) were bound to the complainant, for the knowledge in themselves, of all these things. They expressly covenant "that they are seised and possessed of a good and sufficient title to the premises hereby stated to be sold by them to the said James Galloway, jr."

They took upon themselves to know, that they had the title and

[Galloway v. Finley et al.]

right to the thing sold, and in addition to the legal obligation to that effect, they give an express covenant to the complainant on that subject. That the law'obliged them to know their right, or forfeit their contract, we refer the Court to the case of Allen v. Hammond, 11 Peters, 63; and Hitchcock v. Giddings, Daniel's Exchequer Rep. 1, there referred to, and approved by this Court. In the case just cited, on page 72, Mr. Justice M'Lean, in delivering the opinion of the Court, says: "The law on this subject is clearly stated in the case of Hitchcock v. Giddings, Daniel's Rep. 1; where it is said, 'that a vendor is bound to know, that he actually has that which he professes to sell, and even though the subject matter of the contract be known to both parties to be liable to a contingency which may destroy it immediately, yet, if the contingency has already happened, the contract is void.'" The same principle is in substance to be found in 2 Hovenden on Frauds, 13.

Let us apply the principle of the cases just referred to, to the present. The defendants were bound to know that they had "a good legal title" to the land sold; they covenanted with complainant in March, 1835, to that effect, and in those words: they received from the complainant one thousand one hundred and four dollars on this contract. Seven months after this, (in September, 1835,) the complainant learns, that defendants had no title whatever to the land thus sold, and the defendants admit that they had none at that time: was not this contract void in law, and would it not have been so adjudged had the case been then presented? If so, had not Galloway a right to treat it as the law treats it, as void, and act accordingly. In the case of Allen v. Hammond, the Court say: "if the subject matter of the contract be known to both parties as liable to a contingency which may destroy it immediately, yet if the contingency has already happened, the contract is void." Here the fact, perhaps unknown to both parties, that is, the death of Charles Bradford before the entry, was what destroyed the right to the land sold; it had happened, and therefore the contract was void the moment it was executed.

Galloway being thus, in September, 1835, divested in law of all obligation to defendants under this contract, and the land in question being vacant, he has in good faith made it his own by entering it on his own warrant; or, in other words, he has purchased it of the owner, and the only owner, with his own funds. He has left the warrant in the hands of Bradford's heirs just where he found it, unsatisfied, and unlocated. He has by his entry deprived them of nothing which

they had before his entry. Their warant is as good in the law, and worth as much now as it ever was! It will buy two thousand two hundred acres of land any where in the Virginia reservation. If that territory is exhausted, the faith of a sovereign state is pledged to make good the deficiency; and if that duty, as some say, be transferred to the United States, no one can doubt the ability or the disposition on their part to give full indemnity in money or lands to all bona fide holders of such warrants. Let us suppose, that instead of military land the defendants had sold to complainant congress land, say section No. 10, in a given township, and range. Suppose the complainant possessed, no matter how, of eight hundred dollars in cash, belonging to defendants. The complainant, looking after his title to the 10th section, finds that it has never been entered or bought by any one, in any way, but is open to entry at one dollar and twenty-five cents per acre. Would any court imagine that it then became the duty of the complainant to take the money of the defendant in his hands, and buy of the government the 10th section in defendant's name; or could it be conceived within his province as vendee of a tract of land at any time, to seize the money or property of the vendor, to make good the title which he had contracted for. Such is the case, as contended for by the defendants here. The defendants, indeed, knew that such a warrant, as would appropriate the land in question, was said to exist; but the Court will bear in mind, that neither the warrant nor the patent, if in existence, were then, or are now, either in the hands of complainant, or any one for his use. And this brings us to consider, secondly; whether it is shown by defendants, that Galloway in September, 1835, had it in his power to locate the original warrant of Bradford on the identical land in question at that time, so as to make it certain that by such act he would be able to obtain a legal title without litigation to the land in question.

In the first place, the Court will remember that the warrant was not in our possession; that we had bought and paid for one undivided half of the 2200 acres of Fielding Bradford, who seems to have had just claim as heir, to one-half of the warrant. In the second place, a patent had issued for the identical land in controversy, which seems not to be in the possession of either party. We maintain, that an assignment of the warrant, by the heirs of Bradford, was indispensable to enable us to enter it in complainant's name. But if it be said that our contract for the land supposed to be entered by it is equivalent in law to an assignment, to this we answer, that such entry

[Galloway v. Finley et al:]

would not be good against one holding the warrant with an assignment, without notice of our purchase. Such an assignment may have been made by Fielding Bradford, or by defendants, at any time since 1789; for from that day to this the warrant has been capable of such transfer, never having been lawfully located, at least so far as we are informed, by the facts in this cause. Surely, then, the Court will not say that complainant was bound, for the benefit of defendants, to run this hazard; and thus, in the event of his failure to make the warrant a good foundation for his entry, lose the whole land which he had fairly bought, leaving himself to be charged with that very "*mala fides*," towards those who had bought of him under his purchase from Fielding Bradford, to whom it is admitted he had bound himself to make good legal titles. Nor could the defendant enter "an undivided moiety" of the 2200 acres: he must, in order to make the contract of defendants good, have entered the whole; and hence it became necessary to have command of the whole warrant. Defendants only claim one-half; and what disposition may have been made by the other heir of Bradford of his portion, is not shown to the Court, nor is it presumed to be known by complainant. It is unknown to the Court, and so far as we know, to the parties, whether Fielding Bradford is living or dead. His half of the warrant, if he is dead, descended to his heirs at law! Who are they? Where are they? Are they minors or adults? All these questions at once arise when Galloway is asked, in September, 1835, to use this warrant for the purpose of obtaining a clear legal title to this land. If any doubt existed as to his right so to do, or as to the probability of such act being good, to hold the land and obtain a patent without litigation, then it is clear, the Court will not hold that he was bound to incur such risk. Having bought one *undivided* half of the 2200 acres, and sold, (as he avers, and as is admitted,) on the faith of that purchase; every obligation of good faith and correct morals impelled him to make sure that which was necessary to enable him to comply with his own engagements.

But a patent had issued for the land. We insist that no entry could be valid by virtue of the warrant, the use of which caused that patent to issue, till the patent itself was produced and cancelled. We refer the Court to the usage of the general land office, as laid down in the letter from the Solicitor of that bureau, which we have appended to our argument, showing the difficulties which would have attended an attempt at re-location of the warrant belonging to

Bradford's heirs, by Galloway. If the title was in doubt which was thus to be derived, then the Court will not say that he was under obligation to make any effort to secure the land through that channel. See 2d Hovenden on Frauds, 24–5, and cases there cited.

It becomes a question of primary importance, under this state of things, whether Galloway was bound (after the discovery that defendants had no title to the land, and that it was *then* vacant,) to notify defendants, by writing to Pennsylvania, and giving them an opportunity to search for the warrant; to institute an inquiry for the patent, which must be delivered up and cancelled; to find Fielding Bradford, if living, or his heirs, if he should have died; and, after obtaining all these prerequisites, to come to Chillicothe, in Ohio, and enter the land in their own names. Because he did not do this, he is charged with not only overreaching the defendants, but also *himself*.

To ascertain his duty in such an exigency, we must look at all his liabilities and all the circumstances; for, from a correct view of these are the moral and equitable obligations of men always derived. It is a matter of history that the holders of warrants, since 1830, have been in the habit of laying them on all lands subject to entry, by reason of the previous entry being void as in this case. Many valuable farms, long cultivated and possessed under entries and surveys made in the name of one dead at the time, have been taken from the possessors by subsequent entries. We mean no disparagement to that officer, when we assert that the register himself has been in the habit of ascertaining such cases, and buying warrants, and locating them on lands thus situated. When, therefore, Galloway ascertained this to be the situation of the land he had bought; when he looked to those to whom he had sold on the faith of such purchase, to whom he was bound to make titles; when he saw that this land, thus vacant, was at the mercy of the many speculators who abounded in that quarter in search of such lands; how could he, in good conscience, let an hour pass without placing himself and his vendees at rest as to the title? Had he sent a courier to advise the defendants, before he returned, the land would have been entered, and thus he would forever lose one-half of it already paid for, and forfeit his contracts with all to whom he had sold; whilst the defendants could gain nothing by this idle and dilatory proceeding.

[Galloway v. Finley et al.]

'The only course an honest man could take under such circumstances, was that pursued by complainant: with his own funds he proceeded to make sure of the title necessary to fulfil his own contracts. He bought and paid for the whole, and for one-half of it he has paid twice. Shall all this sacrifice on his part now enure to the benefit of those who have led him into difficulty, from which he has been obliged to extricate himself with his own means, through ignorance of their right to that which they professed to own, but which in fact was not theirs.

But if the complainant had been the trustee of the defendants, constituted by deed to hold for them the very land in question; we contend that he had, under the circumstances, a right to purchase and hold it.

The law is settled, we believe, that where, by a *judicial decision*, the property held in trust is found to be owned by another, then the trustee may lawfully purchase the property and hold it in his own right. This doctrine is founded in reason and equity; when the fiduciary character is terminated for want of an object, the trust is at an end. Hovenden on Frauds, 474–5, 482. Here the land as to ich the supposed trust existed, by the judicial determination of other cases identical with this, was known to all who knew the law, to be vacant land, and to be owned, not by individuals, but by the government. In September, 1835, by the laws of the land, it was not the property of defendants; and therefore no trust in their favour can be raised on a contract concerning it.

'In this view of the subject, the parties, if either had any equity, stood precisely equal. Neither had any right *to the land,* in law or equity. If the complainant has appropriated it by valid entries *first,* he is the owner, and must hold it against all the world. If the possession and ownership of warrants give an equitable right to land, then complainant had equal right with defendants. The latter, in September, 1835, owned a warrant, or part of it, calling for 2200 acres of land in that district; complainant had also a warrant for that quantity; he entered his, and thus obtained a legal right to the specific land, better than the defendants' equity, if such it may be called. In this view of their rights, the well established doctrines apply with full force in favour of complainant. Between equitable claimants, he who has precedency in time has advantage in right. Fitzsimmons v. Ogden et al. 7 Cranch, 2.

Having disposed of the question of right, we think proper to sub-

mit an observation to the Court as to the effect of a refusal to rescind the contract. Complainant prays a rescission; and if that cannot be granted, a confirmation of the title. What compensation can the Court make for the money expended in his second purchase. The land is held by virtue of Galloway's entry; if he is confirmed in this, and the contract still enforced, surely he is to be paid for his warrant. At what price is this to be estimated? If his expenditure enures to defendants' benefit, he should be allowed the amount of that expenditure on his contract? What is that amount? It would seem to be quite impossible by a decree to compel Galloway to withdraw his entry, and go to the register's office, and make an entry on Bradford's warrant in the name of Bradford's heirs. To enable the Court to see the equity of such a decree, it was incumbent on the defendants to show the Court whether this warrant be in existence, and where it is; that it has not been assigned in whole or in part by any of the persons to whom it passed by descent; that it is not in whole or in part in the hands of a bona fide holder by transfer, as above suggested, so as to make it impossible to appropriate land with it. Defendants should also show that this last could be done *now*, upon the instant, so that the land may not be subjected to that result which inevitably awaits it; an entry in the meantime by a third person, so soon as Galloway's entry is declared invalid. They should show that the patent is at hand, to be cancelled as the regulations of the land office require, before any new title can be allowed to exist in its inceptive form, under the old warrant. It was the total want of all these requisites to any safe and sure proceeding of the kind; all of which resulted from the ignorance of the defendants of that title which they assured the complainant they had, and which by law they were bound to *know* they had; it was this accumulation of doubt surrounding the title, which might have been, by possibility, created with the aid of Bradford's warrant, which made it not merely the privilege but the duty of complainant to reject it altogether; and for his own security, to rely on his own funds, to repurchase of the government what he had in vain sought to obtain through the defendants' rights. The Court cannot fail to see how great a perversion of language it would be to apply the phrase employed by Lord Nottingham in Maynard's case, to the conduct of complainant in this. It is said in that case, that equity will not aid one who " over-reaches himself." The idea of a reasonable being setting himself to work to practice knowingly a fraud on himself, which seems the

[Galloway v. Finley et al]

true and only definition of the phrase, is not according to any established notion of human conduct so clearly *possible*, as to admit it amongst those plain and simple elementary truths which compose the great body of chancery law. It might naturally enough, however, suggest itself to a mind perplexed and mystified as his lordship's no doubt was, by the tortuous expedients of one of the parties in that case, to gain an undue advantage. But as there is no similarity between the facts of that case and this, so there is no propriety in applying any rule of that case to the present. Instead of "overreaching himself," the complainant in this case, when he made his entry, stood exactly in the condition of a *bona fide purchaser*, finding his title not merely in peril, but utterly gone. He was *compelled* to protect himself. His is the case which a court of equity will protect against "a creditor, or an heir, or the fatherless." Sugden's Vendors, 723. His own warrant and his own entry, were the only *plank* he could seize in the *shipwreck*, to which the culpable ignorance of the defendants as to their own rights had exposed him.

Mr. Fetterman for the defendants.

To form a correct opinion upon the question, whether the complainant, in this case, does present himself under circumstances which impose on a court of conscience obligations to give him its aid, it will be useful to take a general view of that system of land titles, which has been introduced into the Virginia military district, in the state of Ohio, within which the land in controversy lies. That system of law being made up of usages, and growing out of circumstances, both of which are peculiar to itself, and out of the range of treatises on common law and equity, the bar of Pennsylvania have had little occasion to make themselves acquainted with even the leading features and outlines of those military titles.

So far as my limited knowledge will enable me, I will attempt a concise statement of the several steps by which a military title is perfected. Upon proof to the executive of Virginia, by a person that he is entitled to bounty lands, under the law of that state, for revolutionary services in the Virginia line, on continental establishment; the governor issues his warrant, which is a mandate to the principal surveyor of the military district, directing him to survey for the person entitled to the bounty, the quantity of land specified in the warrant. The warrant does not direct what particular tract of land shall be surveyed; and by usage, the owner of the warrant,

or his agent, has a right to direct the principal surveyor to survey the warrant; that is, the number of acres called for by the warrant, in one or more tracts, on any lands within the district he shall designate, not previously appropriated to the satisfaction of some other warrant. The specification of the particular tract or tracts selected in satisfaction of the warrant, is made in a book kept by the principal surveyor, called "The Book of Entries or Locations." The entry or location, is a mere entry or statement in the book aforesaid, of the quantity of land entered; the number of the warrant which it satisfies in whole or in part; the name of the person for whom the entry is made, together with a general description of the locality of the land entered. Any description which can be reduced to certainty by a subsequent survey, is sufficiently certain and specific; next follows the survey of the entry, which must conform to the calls of the entry; a certified copy of the warrant, entry, and survey on them, is forwarded to Washington city, to the commissioner of the general land office of the United States, upon which a patent issues in conformity with the survey.

The owners of these warrants, for the most part, resided in Eastern Virginia, several hundred miles from the district; and the lands were chiefly taken up, in satisfaction of them, at an early day, while the district was a wilderness: consequently, the whole business of making entries or selections of land, was by agents. These agents were generally deputy surveyors, appointed by the principal surveyor to make surveys for him as his deputies. They, therefore, held the double relation of agents for the owner of the warrants, and deputies of the principal surveyor Every holder of a warrant would naturally seek to get the best lands unappropriated. To effect that object, men who had acquired an intimate knowledge of the localities of the district, such as hunters, Indian spies, &c., were sought after. This class of men took up the business of surveying, and became the deputies of the principal surveyor. The business of selecting land, and making entries and surveys for owners of warrants, fell almost entirely into the hands of this class of men.

There were no lawyers among them. This system of titles and of law, was not therefore marked out by judges and lawyers; but by plain, practical woodsmen, and surveyors, who were ignorant of law as a science. The property of a large and rich country, is based upon their transactions. Courts, therefore, have inquired into their usages, and have sustained their proceedings, wherever they were

[Galloway v. Finley et al.]

not in conflict with established principles of law, which the minis-ters of justice were bound to obey. These deputy surveyors were ignorant of the principles of the common law, "that to vest a title to land, either legal or equitable, there must be a person in esse to take." It was the common opinion of all locaters, that if the entry and survey were made in the name of the soldier to whom the war-rant issued, that was sufficient; without going into the inquiry whe-ther he was dead or alive. As a consequence of this general error, a vast number of entries in the military district, both in Ohio and Kentucky, were made in the names of deceased persons, to whom warrants had issued. It is obvious, that such entries must have been made in ignorance of the law or the facts, as, in every conceivable case, there was every inducement to make a valid entry; and no motive can be conceived for the making of a void one. This subject attracted the attention of the Kentucky legislature, as early as the year 1792. As it was known these entries were numerous in that state, and intended to be bona fide appropriations of the land entered in all instances, a quieting act was passed in that year; which de-clared that lands granted to deceased persons, should descend to their heirs or devisees. Morehead and Brown's Statutes of Kentucky, vol. 1, 779; Littell's Laws, vol. 1, 160. This defect seems not to have come to the knowledge of the locaters in Ohio, who continued the same mode of location till 1830; when the Supreme Court of the United States decided that an entry in the name of a deceased per-son, was a nullity. Galt et al. v. Galloway, 4 Peters, 332. Same doctrine affirmed; M'Donald v. Smalley et al. 6 Peters, 261. By those decisions, the entry in the name of Bradford, in the present case, would be a nullity, were no law of congress affecting it not ap-plicable to those cases. My present purpose is to treat the entry in the name of Bradford, as a nullity; as though this, and the two cases above referred to, were precisely the same in facts and circum-stances. The entry, then, in the name of Bradford, being a nullity, it follows, of course, that the warrant issued in his name remained unsatisfied, and is so to this day; and that the warrant, on the death of Bradford, descended to the heirs of Bradford; Kerr v. Moore, 9 Wheaton, 570; and not to his administrators.

Consequently, the heirs of Bradford, on discovering the invalidity of the entry, had nothing to do but to re-enter the warrant on the same land, and acquire a valid title. In this way, they could have readily cured the defect, if any in the title of the land in question;

for, up to the time of the entry made by the complainant, in September, 1835, the land remained unappropriated, according to complainant's own showing. That the respondents had it in their power to cure the defect in their title, also appears by the complainant's own showing, and by his own conduct; and it was to prevent their doing so, that the complainant kept the defect from the knowledge of the respondents, until he had effected an entry of the land in his own name. Had not Galloway entered this land, but filed his bill for revision of contract, for defect of title, would not the Court have said it is in the power of defendants to perfect their title, and they should have an opportunity of doing so? And how came he possessed of facts which enabled him to detect the flaw in their title? As again appears, by his own showing, through the respondents. They communicated to him the date of the death of Bradford; on comparing which with the date of the entry, he being an old locater, and a party to the suits of Galt v. Galloway, and M'Donald v. Smalley et al., knew full well 'the defects of the title; and equally well did he know that the respondents were ignorant of the defects. When therefore, through the respondents, and in consequence of their contract with him, he became acquainted with this technical flaw in their title, of which they were totally ignorant, what was he bound in equity and good conscience to do? Had he a right to use that information, so acquired, to defeat their title; and to put it out of their power to comply with the contract with him? I think he was bound, by every principle of honesty and fair dealing, to have pointed out the defect to them, that they might remedy it; (a matter so easy for them to effect;) before they would have had to make him a title, which, by their contract, they were not bound to do till January, 1839. If he was not morally bound to point out the defects to them, he certainly had no right to do any act which would prevent their making him a title at the time stipulated.

I take it to be a well settled principle, both in law and equity, that an obligee shall do no act to obstruct or prevent the obligor from complying with his covenants; and if he do, the obligor shall be thereby discharged from its performance. Ballow v. Tucker, 1 Pickering's Rep. 287; Co. Lit. 206; and Bacon's Abridgment, Tit. Condition; 5 Viner's Abr. Condition, 242, &c. And when a complainant comes into a court of equity, liable to such an imputation, it is certain that the court will not grant him its aid, but will leave him to his remedy at law, if any he have, or is entitled to.

That in this case the complainant has, knowingly and dishonestly, done an act which deprives the respondents of the legal power to comply with their covenant to convey a good title; there can be no doubt resting upon the mind of any one who will carefully examine the transactions as disclosed by the bills and answers. The Statute of Kentucky, before referred to, Morehead and Brown, vol. 1, 779; Littell's Law, vol. 1, 160, 1792; shows, that the title was void by reason of a technical rule of law. Yet they are bona fide titles, which in equity had a claim to protection. Hence the passage of that act. The words of that act are as follow: "Whereas, in some instances, grants have issued in the names of persons who were deceased prior to the date of the grant, and cases of the same nature may happen in future; Be it enacted, That in all such cases, the land conveyed shall descend to the heir, heirs, or devisees; in the same manner that it would do had the grant issued in the lifetime of such decedents." This act, though its language extends to the healing of titles where the patent only issues before the death of the patentee, yet the courts of Kentucky have, by a series of decisions, extended the equity of the act to cases where the entry and warrants bore date subsequently to the death of patentee. Hamsford, v. Mineler's Heirs, 4 Bibb's Rep. 385; M'Cracken's Heirs v. Beall et al. 1 Ky. Rep. 208; Bowman v. Violely, 4 Monroe's Rep. 351; Adams v. Logan, 6 Monroe, 177; Lewis v. M'Gee, 1 Marshall, 200; Speere v. Fisback, 1 Marshall, 356.

A recent act of congress, passed May 18th, 1836, entitled "An act to give effect to patents for public lands, issued in the names of deceased persons, provides, that in all cases where patents for public lands have been, or may be issued in pursuance of any law of the United States; to a person who had died, or who shall hereafter die before the date of such patent, the title to the land designated therein shall enure to, and become vested in, the heirs, devisees or assignees of such deceased patentee; as if the patent had issued to the deceased person during life; and the provisions of said act shall be construed to extend to patents for lands within the Virginia military district in the state of Ohio."

It is apparent, from the provisions of the foregoing act, and from the fact that congress saw fit to pass it, that that enlightened body considered as did the legislature of Kentucky nearly a half century before, such titles, though void in law, entitled to protection, as bona fide; and but for the act of the complainant in this case, in entering

[Galloway v. Finley et al.]

the lands in dispute, these respondents, beyond all doubt would, by virtue of the aforesaid act of congress, have had secured to them a perfect legal title to said land; and I shall endeavour to show that they have such a title vested in them, by virtue of said act of congress, notwithstanding the dishonest and fraudulent efforts of the complainant to deprive them of that title—of that hereafter, when I shall have disposed of the case, so far as it rests upon equitable principle. And, it is not my purpose here to discuss the question, "whether Galloway could, under the circumstances, recover in a court of law, on the covenants of these respondents in their contract with him;" whatever may be his right in a court of law. It is very clear to my mind, that a court of equity will leave him to resort to his legal remedies, if any he has; and will not afford him its aid, to enable him to reap the fruits of an attempt to overreach the respondents. It is a leading principle of equity, that a court of chancery, when called on for specific aid, exercises its discretion whether it will interpose; and will in no case interfere when the party seeking its aid has practised any unfairness. He must come into court with clean hands. This principle is as old as the chancery law itself—as long ago as Sergeant Maynard's case, Freeman, Chancery Reports, 1, new edition, lord Nottingham, in delivering the judgment of the court, said "that as this court suffers no man to overreach another, so it helps no man who has overreached himself, without any practice or contrivance of his adversary." 2 Freeman, 106; 3 Swanston, 652, Maynard v. Morely.

Again, "in equity a party is not at liberty to set up a legal defence, which grew out of his own misconduct," 2 Hovenden on Frauds, 16; Morse v. Mentz, 6 Maddocks, 25. Surely, if such a legal defence could not be set up, much less could it be made a ground for relief by a complainant. It s also a familiar rule in equity, "that he who comes into court for assistance, must do equity." Rowe v. Wood, 1 Jac. & Walker's Rep. 333; 2 Hov. on Frauds, 41. "The interposition of courts of equity is governed by our anxious attention to the claims of equal justice; and therefore it may be laid down as an universal rule, that they will not interfere, unless the plaintiff will consent to do that which the justice of the case requires to be done." Fonblanque's Equity, note A. page 190, ch. 4, sec. 41: Phila. ed. 1831.

Now it may be asked, what does the justice of this case require of the complainant? The Court will prescribe such terms to him as justice shall require; and those terms will be, I conceive, that he shall

[Galloway v. Finley et al.]

pay to the respondents the contract price of land, agreeably to his contract. And that the respondents convey or assign to him, out of the unsatisfied warrants belonging to them, a number of acres, equal to the quantity contracted to be conveyed to him by them, and which he has put it out of their power to convey. Both parties will then stand as they would have done had the complainant not interfered, and respondents re-entered and perfected their title. A vendor is entitled to specific performance, though he have no title at the sale, if he can make one before the master's report. 10 Vesey, jr. 315; 14 Vesey, jr. 205. There are many cases in which, though courts refuse specific performance, yet they will not rescind contracts. 1 Wheat. 196; see also 2 Story's Equity, 88, and the cases there referred to.

This, I take it, would be fair and equitable, were the courts authorized and disposed to interfere in granting relief in any shape.

But if I have a correct view of the case, and the principles which should govern it, no relief whatever can be granted. A decree of dismissal of the bill, with costs to the respondent, is all that can be done, and that on the ground that complainant asks the aid of the Court to enable him to overreach the respondents; and that is all that I can discover he does seek.

I have thus far discussed the case, on the hypothesis that the title of the respondents was null and void. I shall now endeavour to show that though it was so in its inception, the law has come to their relief, and made that a valid title, which at one time was declared by courts to be a nullity.

And the entry made by Galloway in September, 1835, is null and void, on the ground of its being an illegal interference with the rights and title of the respondents, in violation of an express prohibition of law.

Up to the year 1807, the patent granted in the name of Bradford, a deceased person, was a mere nullity; it is conceded in the authorities already cited. And any person holding a military warrant, might have entered the land it covered.

But since the 2d March, 1807, it is believed the lands covered by the warrants in the name of Bradford, have not been open to the entry of any other person, or liable to be covered by any other warrant.

On the 2d of March, 1807, congress passed an act, the 1st section of which extended to owners of military warrants a further term of three years to complete their locations; which act had the following

VOL. XII.—2 O

proviso: "Provided that no locations as aforesaid, within the above-mentioned tracts, shall, after the passing of this act, be made on tracts of land for which patents had previously been issued, or which had been previously surveyed. And any patent which may nevertheless be obtained for land located contrary to the provisions of this section, shall be considered as null and void."

In May, 1826, 7 vol. Laws of U. S. 516, congress passed an act extending the time for making locations till 1st of June, 1832. The 3d sec. of that act contains the prohibition of the act aforesaid of 1807; and extends that prohibition to United States' lands, which the act of 1807 did not do.

On the 31st of March, 1832, congress passed another act, extending locations for seven years. It being an extension of the act of 20th of March, 1826, of course has the prohibiting claim as to military lands, and is now in force.

In the case under consideration, there was both a survey and patent; and it furnishes a case clearly within the provision referred to. That the proviso could have been intended only for valid surveys and patents, is idle to suppose; such needed no protecting legislation. The proviso was intended to protect lands defectively located and patented, no doubt; and so the Supreme Court of the United States have decided. Doddridge v. Thompson, 9 Wheat. 481. In that case the Court say: "The records of this Court show, that many controversies were produced in that county by the mode of locating and surveying military lands, which had been adopted under the laws of Virginia; and it is not unreasonable to suppose that congress, when giving further time to make locations and surveys, might be disposed to cure the defects in titles already acquired, and to prevent second locations on lands already located. The words of the proviso, too, are adapted to the saving of private rights."

In the case of Doddridge v. Thompson, the defendant attempted to protect his title under the proviso of the act of 1807, on the ground that the survey of the plaintiff was made in 1810, after the passage of that act. But the Court decided that the proviso was not applicable to sales of land at the United States' land offices; and was intended to embrace only military surveys and patents. Besides, the prohibition was only as against locations, and the facts of the case did not show but the location was made previous to the passage of the act of 1807; and in the absence of proof on that subject, the Court would presume that the location was made previously in support of the

[Galloway v. Finley et al.]

patent of plaintiff.   The reasoning of the Court in this case, plainly shows, that had the defendant's title been one of military origin, and the location of the plaintiffs been after the passage of the act of March, 1807, his (the defendant's) title must have prevailed by reason of the proviso aforesaid.

In the case under consideration, the title of the respondents is of military origin; and the location, survey and patents, all bear date previous to the passage of the act of 2d March, 1807.

The title of the complainants is also of military origin, and his location and survey are both since the passage of the act of March 31st, 1832, now in force, and containing the proviso of the act of 2d of March, 1807.   It is not easy, therefore, to conceive how the location of the complainant, made on 26th of September, 1835, can possibly escape the operation of the proviso of the act of March, 1807, and the prohibition contained therein.   The location of the complainant's coming within that prohibition, then, as I humbly conceive it clearly does, it must be null and void.   And the title of the respondents being thereby freed from the embarrassments of Galloway's entry, is by the healing operation of the act of 18th May, 1836, made good and valid.   It may not be amiss to remark here, that so vigilant has congress been in protecting defective titles, acquired, bona fide, that after the decision in the case of Doddridge and Thomps. ., in which the Court decided that the proviso of the act of 1807 did not extend to lands under the United States' survey; in the very next renewal of the extension of time for making locations in military lands, the prohibition was made to extend to lands within the district sold by the United States.

The decisions in the cases of Galt v. Galloway, and McDonald v. Smalley and others, (which have no doubt been relied upon by the complainant, to sustain him in his illegal and unjust course of conduct in this case, being a party to both those cases,) can have no bearing on this case.   The facts in this case are so widely varying from the facts of those cases, as to render them entirely inapplicable.

In those cases the party holding title under the entries made in the name of the deceased person, could not avail himself of the benefits of the proviso to the act of 1807; as the entries and surveys in each case, by both parties, were made previous to the passage of that act.

In Galt v. Galloway, Galt's entry was made in August, 1787, 4 Peters, 333, and the withdrawal in 1805, five years after Galt's

death, and two years before the passage of the act of 1807. In
M'Donald v. Smalley et al., M'Donald claimed under an entry made
24th August, 1787, in the name of David Anderson; at which time
Anderson was proved to have been dead. The defendants, Smalley
et al., claimed under an entry on some land made the 19th of Feb-
ruary, 1793, in the name of Stephen T. Morou, and a patent to Morou,
in 1796, and before a patent issued on M'Donald's entry. These
cases, therefore, not coming within the provision of the act of 1807,
do not conflict, in the least, with the opinion of the Court in the case
of Doddridge v. Thompson, as to the intent of congress, and the heal-
ing operation of the act of 1807; nor with the doctrines I contend for
in this case. The patent to Charles Bradford, the ancestor of respon-
dents, purports to vest in him a legal title to the land in controversy.
If the act of 1807, and subsequent acts of congress referred to, embrace
this case, as I think has been clearly shown they do; (and the more
so, since being healing and remedial acts, their provisions are to be
construed liberally;) then the benefits of those acts enure to the heirs
or devisees of said Bradford. If the title be cured at all by those
acts, it is so far cured as to make it a legal title; for the patent must
convey a legal title, if it pass any: of consequence, if the patents to
Charles Bradford convey a legal title, the title of the respondents is
a good and valid legal title, to the extent they covenanted to convey.
And the ground of complaint on the part of Galloway is gone: and
his bill must be dismissed with costs.

I find nothing in the argument, or in the authorities cited in the
argument in the circuit court, to shake my confidence in the legal
title of the respondents, as cured by the acts of March, 1807, and
May, 1836.

The case of Dunn v. M'Arthur, decided in July, 1836, so far as the
record of the decree discloses, has no bearing upon the question.
The case as stated by the gentleman, might be considered as of some
weight. But is he warranted in his statements by the records. The
decree was taken pro confesso, and of course assumed as true all the
allegations made in the bill. The bill undoubtedly contained the
allegation, that the entry, location, and patent were void, having been
made in the name of a deceased person; and at the time of the filing
of that bill, (which is evident from the record must have been prior
to the act of May, 1836,) there is as little doubt that the entry, loca-
tion and patents, were null and void. But by the act of May, 1836,
they were made good and valid; and had that act been known and

relied upon at the time of the entering of the decree, it is manifest a different decree would have been the result. It does not appear that the act of May, 1836, was at all relied upon, or that its existence was known; and it is fairly presumable that it was not known, as the decree was entered but a few days after its passage, and the cause was suffered to go off without any defence. I take it, therefore, that the act of May, 1836, was not in question; and the decision or rather decree,-for there was no decision of consequence, has no application to the case under consideration. It could not, any how, be taken as of any force in the garbled state in which it appears. Had the point been decided, as stated by the complainant's counsel in the circuit court, a full record would have been produced; and this Court would not have been asked to rely upon the bare statement of counsel.

The case of Blight's Lessee v. Rochester, 7 Wheat. 548, does not impugn the doctrine, that an obligee or covenantee has no right to do any act to prevent his obligor or covenantor complying with his obligation or covenant. The question in that case was one of estoppel. The doctrine of estoppel does not apply to this case, nor does the question at all arise. I am unable to discover the least analogy between that case and this. Had the contract sought to be rescinded in this case never been entered into, but an action of ejectment brought by these respondents against Galloway; and in defence of such action Galloway had set up his subsequent entry, and the defective entry and survey in the name of Charles Bradford, to defeat the plaintiffs' title; and in answer to that defence the plaintiffs had insisted upon Galloway's recognition of Charles Bradford's title by his purchase from one of the heirs of Charles Bradford, (Finley Bradford of whom he purchased an undivided moiety,) and claimed that he should be thereby estopped from disputing the legality of Charles Bradford's title; then the case cited from 7 Wheaton might have had some application. But that is not this case. I do not deny that after the vendee has received his deed, and all the title the vendor can give, he may have the right of purchasing in other interests to fortify his title. But he shall not be permitted, before he has received a deed, to procure an outstanding title; and then claim to have his contract rescinded because by his own act he has put it out of the power of the vendor to comply with his covenant or agreement. The utmost he could claim under any circumstances, I apprehend, would be to have the amount paid for the outstanding title deducted from the purchase money due: to make it a ground of an-

[Galloway v. Finley et al.]

nulling the contract and avoiding the payment of the purchase money entirely, would be monstrous injustice: such as I believe a court of equity will never sanction or listen to.

If it is at all doubtful whether the respondents have the legal title in ordinary cases, it is presumable that Galloway would have applied to the courts, either state or federal, within whose jurisdiction the land lies; and who would be considered competent at least, in the first instance, to make a proper application of the principles of the *lex loci rei sitæ.*

He, however, has thought proper to resort to another tribunal, and from their decision he has appealed to the highest tribunal of the Union. To that tribunal the defendants in error also come, confiding in the justice and honesty of their case; believing that the great judicial council of the nation will continue to administer justice in equity: and who, although the decree they may make may not settle the controversy, so far as regards the title to the land itself, will yet, by their opinion in this case, reaffirm the great and well-settled principles of the law of equity that must govern this controversy in all its bearings; wherever pursued, and wherever determined.

Mr. Justice CATRON delivered the opinion of the Court.

The bill alleges that complainant, on the 11th of March, 1835, purchased from Henry R. Finley, and David Barr, who acted for himself and wife, the sister of defendant, Finley, the moiety of two tracts of land lying in the state of Ohio; one for one thousand two hundred, and the other for one thousand acres, founded on a warrant for two thousand six hundred and sixty-six and one-third acres, obtained by Charles Bradford, as an officer in the revolutionary war, in the Virginia continental line. That Finley, and the wife of Barr, were the heirs of their mother; who derived by descent a moiety of the lands from her father, Charles Bradford.

Galloway agreed to pay eight thousand dollars for the moiety of the two tracts, part in hand, and the balance by instalments; the last of which was to fall due on the first of January, 1839. And Finley and Barr, covenanted with complainant to convey the moiety of the lands contracted for, in fee, so soon as he paid the purchase money.

It is also alleged Finley and Barr promised, at the time the agreement was made, to forward from Pennsylvania, where they resided, to Galloway, who resided in Ohio, the title papers, and the power of attorney, authorizing Barr to contract for his wife.

[Galloway v. Finley et al.]

That after the date of the contract, the wife of Barr died, a minor, intestate, of course, and without issue.

As grounds of relief, it is averred that the title papers were not forwarded, nor the power produced. But, principally, that after making the contract, the complainant discovered Charles Bradford, the grantee, had died in 1789; and that the lands were entered, surveyed, and granted in his name, in 1793, and 1794.

Finley and Barr, by their answer, admit the contract to have been made as stated; deny that title papers were to be furnished by them; admit they promised to forward the power, and the death of Mrs. Barr, but allege respondent Finley was her sole heir; admit Charles Bradford died in 1789, and that the lands were entered and surveyed in 1793, 94, and afterwards patented in his name.

The respondents, however, mainly rely for their defence on the fact, that, on the 26th of September, 1835, the complainant, Galloway, entered the two tracts of land, the moiety of which was agreed to be conveyed, in his own name, and, as they allege, without their knowledge, and with the fraudulent intent of depriving the heirs of Bradford of it; and thereby to render it impossible for them to comply with their contract. And the defendant, Finley, for himself, and as heir of his sister, offers to comply with the agreement.

It is urged, the entries, surveys, and grants in the name of Charles Bradford, after his death, were void. Suppose the fact to have been so when the agreement of March, 1835, was made, and that the lands were subject to appropriation when Galloway entered them, in September, 1835, then the rule applies—"That if a vendee buys up a better title than that of the vendor, and the vendor was guilty of no fraud, he can only be compelled to refund to the vendee the amount of money paid for the better title." Learey v. Kirkpatrick; Cooke's Ten. Rep. 211; Mitchell v. Barry, 4 Hayne's Ten. Rep. 136. In reforming the contract, equity treats the purchaser as a trustee for the vendor, because he holds under the latter: and acts done to perfect the title by the former, when in possession of the land, enure to the benefit of him under whom the possession was obtained, and through whom the knowledge that a defect in the title existed, was derived. The vendor and vendee stand in the relation of landlord and tenant; the vendee cannot disavow the vendor's title. 3 Peters, 48; 2 Marshall's Ky. Rep. 242; 5 Yerger's Ten. Rep. 398. This case furnishes a fair illustration of the propriety of the principle. Charles Bradford was a non-resident; that he had died before the

[Galloway v. Finley et al.]

lands were entered and granted, was unknown to Galloway until he obtained the information through the heirs of the grantor, after the sale; for forty years the title had been deemed valid, and the defect was exposed by the production of his will, and the endorsements of its probate, in 1789. The fact, thus ascertained, was confidential in its character as between the parties to the contract; and Galloway could not be permitted to avail himself of it whilst standing in the relation of a purchaser, to defeat the agreement: under the most favourable circumstances, he could only have it reformed, and the amount advanced to perfect the title deducted from the unpaid purchase money. But this is not the attitude the complainant assumes by the bill first filed. He claims an entire rescission.

On the 20th of May, 1836, pending the suit, congress passed an act, 4 Story's Ed. 24, 36, to give effect to patents issued to deceased persons; which provides, " that grants issued to persons who had previously died, should enure to and become vested in the heirs of such deceased patentee, as if the same had issued to the deceased person during his life; and that the provisions of the act should be construed to extend to patents for lands within the Virginia military district, in the state of Ohio." .

That the legal title to the lands patented in the name of Charles. Bradford, vested in his heirs by force of the act; cannot be denied. 9 Cranch, 43; 2 Wheat. 196. Grant, then, all that is claimed for the complainant; still his entries of September 1835, conferred a mere equity, and the defendant, Finley, holds the fee: and the complainant, by raising the warrants from his entries, will have sustained damage only to the amount of the officer's fees: or, take it the other way, and compel Finley and Barr to compensate for the warrants, then of course they would be entitled to them, and the effect be the same. Had Galloway's entries been valid, and had he acted in good faith as regards the defendants, by giving notice of the means used to perfect the titles; and had he sought by the bill, what in equity and conscience he was entitled to as compensation, a court of chancery could not have refused relief: but he invokes aid to defeat the entire contract, and nothing less, in sanction of acts intended, from his own showing, to deprive the complainants of their money and lands; thus assuming an attitude before the Court, and asking its active aid, under circumstances, that, were he a defendant, and set up like claims, it would be difficult to say he could be compensated: as a complainant, he surely cannot be heard.

[Galloway v. Finley et al.]

Then as to the loss of the warrants and fees: it having been the clear duty of the appellant to enter the lands for the benefit of his vendors, and only to have demanded compensation for expense and trouble: and he having entered for himself; a court of equity must decline to assist him, (in the language of Mr. Justice Story, 2 Story's Eq. 8,) to escape from the toils which he has studiously prepared to entangle others: it must be left to him to get rid of his entries, and secure the benefit of his warrants. The act of congress having conferred on the defendant, Finley, the legal title, equity will not take from him his legal advantage. 1 Wheat. 196; 2 Story's Eq. 88; Sugden on Vendors, 365, 375, 7th ed. If Finley has the title, and can perform the contract on the 1st day of January, 1839, when the last payment falls due, this is all the law can require of him. Yet it is an established rule in equity, that where the vendor has not the power to make title, the vendee may, before the time of performance, enjoin the payment of the purchase money, until the ability to comply with the agreement for title is shown; Royer v. Patton, 1 Ten. Rep. 258: Ralston v. Miller, 3 Randolph's Va. Rep. 44; but then the court will give a reasonable time to procure the title, if it appears probable, on reference, that it may be procured. Frost v. Bronson, 6 Yerger's Rep. 36, 40.

By an amendment to his bill in October, 1836, the complainant sets forth his entries of 1835, and the surveys thereof, and again prays a rescission of the contract of March, 1835: "or, that if the defendants at the date of the contract, had a good and perfect title to the premises they contracted to convey, and authority to perfect their agreement; then the complainant is ready, and tenders a completion of the contract."

The only allegation in the amended bill, varying the case is, that at the time the agreement was entered into, complainant was ignorant that the patents for the lands had been made in the name of a person that was dead. The respondents admit the fact: but state that complainant derived his first knowledge of its existence from a sight of Charles Bradford's will, after he made the agreement. It seems respondents were at that time equally igr rant, not knowing, or having overlooked the dates of the entries and patents. If complainant had not entered the lands, then he would have been entitled to a rescission of the contract; had no title been acquired by the defendants, through the medium of congress.

The principal ground relied on for relief being, that the patents

were void, because made after Charles Bradford's death; we will proceed to examine it.    That a patent thus made, passes no title, is true in the nature of things; there must be a grantee before a grant can take effect; and so this Court held, in Galt v. Galloway, 4 Peters, 345; and M'Donald v. Smalley, 6 Peters, 261.    Yet this is not the question presented; it is, whether the appellant was permitted to enter the lands purporting to have been granted to Charles Bradford, notwithstanding his death?    And this depends upon the act of 1807, ch. 34, and others, continuing the provision up to the date of Galloway's entries.    The time for locating Virginia military claims for services on the continental establishment, between the Little Miami and Sciota rivers, had expired; and by the act, congress extended the time.    But on reopening the land office, the following exception was introduced: "Provided, That no locations as aforesaid, within the abovementioned tract, shall, after the passing of this act, be made on tracts of lands for which patents had previously been issued, or which had been previously surveyed; and any patent which may nevertheless be obtained for lands located contrary to the provisions of this section, shall be considered null and void."

. It is insisted, for appellant, that the section had reference to imperfect, and not void titles.    The legislature merely affirmed a principle not open to question, if this be the true construction.    Had an effective patent been issued, the government would not have had any title remaining, and a second grant would have been void of course.    Something more, undoubtedly, was intended than the protection of defective, yet valid surveys and patents; this is not denied, but the argument insists only irregularities were intended to be covered.

It is difficult to conceive how an *irregular* patent could exist, unless it passed no title.    We will not perplex the decision with supposed cases of irregular surveys, but examine the act of congress, and ascertain its effect as regards the grant in the name of Charles Bradford.    It is fair upon its face, and we will not look behind it for irregularities.    7 Wheat. 214.    The death of the grantee is an extrinsic fact, not impairing the equity of the claim as against the government.    His heirs had an interest in common in the military district, with all similar claimants.    The truth of the position is unquestionable.    Jackson v. Clarke, 1 Peters, 635; Neal v. E. T. College, 6 Yerger's Rep. 79, 190.    The defects, of all others most common, in the military grants of Kentucky, Tennessee, and Ohio, were, where the soldier had died, and the entry, survey and grant

had been made in the name of the deceased. In his name the warrant almost uniformly issued; who the heirs were, was usually unknown to locators, and disregarded by the officers of government when perfecting titles. In Tennessee and Kentucky, provision was made at an early day, that the heir should take by the grant; and why should we presume congress did not provide for the protection of his claim to the lands purporting to have been granted; when the legislation of the federal government was, of necessity, controlled in this respect, by the experience of members coming from states where there were military lands? The statute is general, including by name all grants, not distinguishing between void and valid; and the plainest rules of propriety and justice require that the courts should not introduce an exception, the legislature having made none. 1 Peters, 636, 638; Martin & Yerger's Ten. Rep. 361.

But it is insisted this Court did make an exception in the cause of Lindsey v. Miller, 6 Peters, 666; and which should be followed. What was that case? A grantee from the government sued a defendant in ejectment, claiming, in the military district of Ohio, by virtue of an elder entry and survey; and the question was, whether the junior patent to plaintiff was void, because made contrary to the act of 1807. The defendant's entry, by mistake, had been founded on a warrant for services, not in the *continental* line, but in the *Virginia state line;* a claim not subject to be satisfied in the Ohio military district. 7 Wheat. 1. The location and survey were therefore mere nullities; and the Court very justly held, that congress did not, by the act of 1807, contemplate such claims, and that they were not within the purview of the act. But had the claimant been entitled to the satisfaction of his warrant in the military district, in common with others, for whom the government held as trustee; the case might have been very different, even had the entry and survey been invalid. Congress had the power in 1807, to withhold from location any portion of the military lands; and having done so, in regard to that previously patented in the name of Charles Bradford, the complainant, Galloway, had no right to enter the same. His location being void, it follows, the act of 20th May, 1836, vested the title to a moiety in the defendant, Henry R. Finley, exempted from any influence of the entries.

The decree of the circuit court is therefore affirmed, and the bill ordered to be dismissed.