## WALWORTH vs. MILES.

A sub-commissioner reported the measurement and estimates of the value of work
done and furnished by M., a levee contractor, and the reports were confirmed
by the Board of Swamp Land Commissioners. M. then applied to enter certain
lands in part payment of the sum reported due him for levee work, and received
from the Secretary of the Board a certificate that he had applied to enter the
lands, and also a certificate of the balance due him after deducting the price of
the lands. The Board afterwards, on ascertaining that the levee work was in-
sufficient, rejected the reports, and canceled the certificates : *Held*, that the re-
ports of the sub-commissioner, their confirmation by the board, and the issu-
ance of the application certificate, etc., did not constitute a complete sale of
the lands, so to pass the matter beyond the control and revoking power of the
commissioners—that they had the authority to cancel the certificates on ascer-
taining the insufficiency of the levee work, of which they were the judges—that
a sale by them was not complete until the lands were legally paid for, and a
patent certificate issued.

Where parties to a contract for the sale of lands mutually manifest an intention to
repudiate and abandon the agreement, by a series of acts in hostility to it, nei-
ther of them can afterwards enforce the specific performance of the contract
in chancery.

*Appeal from Chicot Circuit Court in Chancery.*

Hon. J. C. MURRAY, Circuit Judge.

GARLAND and HEMPSTEAD, for Walworth.

PIKE & SON, for Miles.

Mr. Justice FAIRCHILD delivered the opinion of the court.

In May, 1852, Miles endeavored to enter at the Swamp Land
Office, in Helena, about forty-six hundred acres of land, most
of which was then in the occupancy of Walworth, and which,
known as Point Chicot, had comprised his plantation from 1828

and 1836. The lands in question, with other lands that were occupied by Miles, were within the limits of the De Villemont claim, which had caused them to be reserved from sale by the United States. This claim being about this time adjudged to be bad, the lands were taken to be within the swamp land grant, and Miles early availed himself of the opportunity, thus afforded, to secure, with other lands, those upon which Walworth had long resided. Walworth maintains that his possession should have exempted the lands occupied by him from entry by Miles: and that the claim of Miles is founded on a violation of the rules of fair dealing, of good neighborhood, and of the personal relations between the parties, growing out of Walworth's exertions to defeat the De Villemont claim.

This part of the case may be passed over with the remark, that courts take no notice of personal obligations, or social duties, unless they involve legal rights. And this is a rule in equity as much as in law, for an equitable right is only a right to relief that cannot be redressed at all in a court of law, or as well as in a court of equity; it is not in any case a question of courtesy, of propriety, or of good behavior. The effect, then, that is to be given to what Miles claims to have been an entry of the Walworth lands, must be that which the law ascribes to it, disconnected from any question growing out of Walworth's possession, unless the law affixes a legal right to his possession.

Previous to the 6th of May, 1852, Miles had contracted to do, and furnish levee work for the Swamp Land Commissioners, in townships fifteen south, range one west, and fifteen south, range one east; and estimates of the work had been made, by which a sub-commissioner reported that for work done in section twenty-five, in the former township, Miles was entitled to the sum of two thousand, four hundred and fifty-nine dollars and eighty-nine cents; and that for work done in township fifteen south, range one east, he was entitled to the further sum of two thousand, three hundred and forty-two dollars and forty cents. Upon these reports, a confirmation was endorsed, signed by three commissioners, but the order of the Board of Commis-

sioners approving the estimates, and ordering the sums named to be paid, was made upon the 6th of July, 1852; and this we take to be the first regular meeting of the board after the reports of the sub-commissioners were filed in the swamp land office. There was also endorsed upon each estimate, a receipt of payment by Miles, the first receipt expressing the payment to be in an application for lands in township fifteen south, range one east; the second, for the same, and for a certificate of thirteen hundred and fifty dollars and ninety-nine cents. These receipts were dated the 10th of May, 1852, as were also the following papers—an application of Miles, and certificate of application :

" I, James B. Miles, do hereby apply for the purchase of frl.
" sec. 4; frl. sec. 5; frl. sec. 7; sec. 8; frl. sec. 9; frl. sec. 16; sec.
" 17; frl. sec. 18; frl. sec. 19; frl. sec. 20, and frl. sec. 30, contain-
" ing 4,548.28 acres, all in 15 south, 1 east, in payment for
" levee work done, and received by the commissioners, or scrip
" issued to ———— by the Swamp Land Commissioners under act
" of the Legislature of Arkansas, approved 6th and 11th January,
" 1851.

"JAMES B. MILES."

" Office of the Board of Swamp Land Commissioners, }
                    " *Helena, Arkansas.* }

" This certifies, that James B. Miles has this day applied,
" at this office, to purchase the following lands, to-wit : frl. sec.
" 4; frl. sec. 5; frl. sec. 7; sec. 8; frl. sec. 9; frl. sec. 16; sec. 17;
" frl. sec. 18 ; frl. sec. 19 ; frl. 20, and frl. sec. 30, containing
" 4,548.28 acres, in 15 S., R. 1 East, in payment for levee work
" done and received by the Board of Swamp Land Commission-
" ers, or scrip.

" W. E. BUTTS, Secretary."

These papers, the estimates mentioned, and their approval by the commissioners, constitute the claim of Miles, and must make it a title if the commissioners thereby sold the land to Miles, so as not to be able to suspend their allowances of pay

to him, and also his application to receive his pay in the lands and in scrip.

But at the same meeting of the Board of Swamp Land Commissioners, and the next day after the allowance to Miles of the sums of money named in the estimates, the following order was made: "Now on this day came H. F. Walworth, and filed his " protest against the sufficiency of the old levee as reported by " John A. Craig, in township 15 south, range 1 east, as the levee " of James B. Miles, and the further payment to said Miles for " the same until the subject matter of the protest can be investi- " gated by the board.

" And the same having been fully considered by the board, it " was ordered that the application of the said Miles for lands " upon said report, and also the report of 15 south, 1 west, be sus- ". pended, and also the payment of the certificate issued for the " balance of his allowance for the said levee, until the sufficiency " of said levee, and the claims arising thereon, shall be fully adjust- " ed; and it is further ordered, that said Miles be notified of the sus- " pension herein until the next meeting of the board, to be held " at Helena, on the first Monday in October, 1852, to which time " the further consideration and action in this cause by the board " is continued.

And at the next term of the board, the following order was made:

" Now on this day came Horace F. Walworth, and the mat- " ters and things arising upon the protest heretofore filed by " him against the levee reported by John A. Craig, in favor of " James B. Miles, situate on the west side of the Mississippi " river, in township 15 south, of range 1 east, for the insuffici- " ency of the size of said levee, and for other causes, coming " up for hearing by the Board of Swamp Land Commissioners; " and it appearing, to the satisfaction of the commissioners, " that said Miles had received due notice of the same, or that " the same had been forwarded to him, that his cause would " come up for hearing at this session of the board, and the said " Miles not appearing, the board proceeded to hear testimony ·

"in support of the allegations contained in said protest, and
"having fully heard the same, and fully considered what order
"to make herein, it is ordered that the report of said levee,
" amounting to the sum of $2,342 40, be, and the same is here-
" by rejected, and the entries made by said Miles in said town-
"ship, by virtue thereof, and the certificate for the balance
"thereof, granted by the secretary to said James B. Miles, be
" and the same is hereby rescinded, canceled and held for
"naught."

To understand, fully, the next order of the board, it may be
stated here, that after the order of the board suspending the en-
try of Miles, had been communicated to Walworth, he wrote
from Louisville, Ky., under date of 12th July, 1852, to Hornor,
that, being informed of the suspension, he was anxious to prevent
any other person from entering the lands in the event of the en-
try of Miles being rejected, and requested Hornor to enter them
for him, if the secretary could permit it to be done. The secre-
tary permitting, Hornor, on the 21st of July, 1852, entered, in
the name of Walworth, twenty-five hundred and three 84-100
acres of land, and at the bottom of the certificate the secretary
noted that the lands embraced in it had been before entered by
Miles, but that his entry was suspended by an order of the Board
of Swamp Land Commissioners.

The next and final order made upon the allowance of the ap-
plication of Miles, was made by the board on the 6th of January,
1853, and is thus :

" This day came James B. Miles and protests against the
" action of the board upon the sufficiency of the levee work as
" reported by the sub-commissioner, and the entries of land
" made by him at this office on account of said levee work.
" And also came Horace F. Walworth and protests against the
"sufficiency of said work, and prays it may be examined by a
" suitable engineer, and against being disturbed in his claim to
" the lands which he was permitted to enter after the entry of
" said Miles had been canceled by order of last meeting of this

42

" board. Thereupon the board do order the further considera-
" tion of this subject to be dismissed, and leave the parties to their
" rights at law in the premises."

This is called the final order upon the application of Miles,
notwithstanding that, on the 5th of April, 1853, it was ordered
by the board that the application should be certified to the Audi-
tor of the State. For assuming that this, which was done on
motion of John A. Craig, was at the instance of Miles, it could
not operate for his benefit, for the commissioners had no authority
to make such a certificate ; and when made, it would be of no
avail, as seems to have been understood by the secretary of the
board, who made no return of the order in a regular official re-
port, but merely sent the list of lands applied for by Miles to the
Auditor, upon a sheet of loose paper, as upon the motion of John
A. Craig, which the Auditor properly considered as no report
that Miles had entered the lands.

By the 6th section of the swamp land act of 6th January,
1851, it was provided that when a contractor had finished his
work according to his contract, and had selected land in pay-
ment of it, or had located his scrip therefor, and had furnished
the numbers of the land selected, or located, to the commis-
sioners, the commissioners should certify these facts to the gov-
ernor, who should execute a deed for the lands. And by the
8th section of the same act, when lands were sold by them, for
scrip, they were to furnish the purchaser with a certificate of
purchase and payment, which would entitle him to a deed for the
lands.

Such a certificate as Craig moved to have made, though
made with as much form as the Board of Commissioners, or
their secretary could clothe it, would not have been a certificate
under either of the sections quoted, and the commissioners had
no power to give any other. They could sell the land, and
they could give certificates of sale, on payment being made,
but had no authority to give certificates of application for the
purchase of lands, when the work for which the lands were to
be passed as payment, had been rejected, the attempts at their

entry suspended, and the scrip, which had been issued for an excess of the estimated value of the work over the price of the lands, had been canceled after full opportunity for investigation of the levee work. This case calls for an application of the principle heretofore announced by this court, that the title to the swamp lands was not in the commissioners; that they derived their power to sell from the statutes upon the subject, whose requirements they must observe, to make a lawful sale. *Cheatham vs. Phillips*, 23 *Ark.*

The certificate of application for lands, which was the only one Miles ever received, from Ordinance No. 9, *Hempstead's Swamp Land Laws*, 48, does not seem to have been intended, as it was not in terms, a certificate of purchase; but when the lands should be confirmed to the State, the application, if found to be correct, and accompanied with the scrip, or with an authenticated account of the levee work, whichever the application was founded upon, would entitle the applicant to a final certificate of purchase. This course of procedure, which seems first to have been a rule adopted by the commissioners, probably in analogy to the form of entry in the United States land offices, was afterwards sanctioned by legislative enactment, when the final or patent certificate was required to be issued by the land agent of the district upon the surrender of the certificate issued by the commissioners, and upon finding that the lands had been paid for, had been confirmed, and were not the subject of conflicting claims. *Act of* 20t*h January*, 1855, *sec.* 1, *Gould's Dig.* 730.

The certificate which Miles must have obtained before his entry was complete, before he could demand a deed from the governor, under the 6th section of the act of 6th January, 1851, was a patent certificate, as much as that afterwards provided for by the 1st section of the act of 20th January, 1855, transferring the issuance of the final certificate of purchase to the land agent. They are so styled in a case strongly litigated before this court, and the certificates in that case showed the times when the applicant filed his lists of lands, the times ot

his application to purchase, and of his completion of the purchases. *Hempstead vs. Underhill*, 20 *Ark.* 344.

So far as the claim of Miles depends upon the action of the State authorities, it rests where it was left by the commissioners in January, 1853, when they refused to modify their order of October, 1852, that rescinded the entry of Miles in township 15 South, range 1 East, and canceled his scrip on account of their rejection of the estimate that allowed Miles twenty-three hundred and forty-two dollars and forty cents. And this order shows what must be the result of the claim of Miles, unless it be, as contended for by his counsel, that the lands had previously vested in him by the favorable report made by the sub-commissioner upon his work, by the approval of that report by the board, by Miles' receiving in payment for the amounts of the estimates of his work, the lands, and the scrip that represented the difference between the price of the lands and the estimates of the work : and that being so vested, the orders and action of the board in suspending the approval of the estimates, and in finally rejecting the application of Miles, and canceling his scrip, could not deprive him of a vested estate in the lands.

It may be conceded that if the commissioners had once sold the lands to Miles, it was beyond their power to divest the title resulting from a sale, but the point is, whether the lands were sold until the commissioners had made the certificate to the governor, under the 6th section of the act of 6th January, 1851.

To sustain the argument for Miles is to hold that a favorable report by a sub-commissioner once made upon the levee work of Miles, and the consequent allowance for its payment, and an application to take lands in payment, are forever binding upon the board and the State, notwithstanding, before any certificate of purchase is made by the commissioners, it be ascertained that the report is flagrantly incorrect or false, from the ignorance, carelessness, or dishonesty of the subordinate agent, who made the report. A statement of such a proposition carries with it its own refutation. No matter what efforts had been made by Miles to obtain the lands, nor what concessions

had been made by the commissioners, whenever they ascertained that the levee work of Miles was an old levee, not built nor owned by himself, and that either it, or new levees included in his estimates, were not such work as should have been accepted, or should be paid for; at any time before their final certificate of purchase of the lands, and payment for them, it was the right and duty of the commissioners to refuse to consummate the sale. The approval of the estimates of the work of Miles made by the board upon the 6th of July, 1852, did not, then, preclude them from suspending the allowance on the next day, or at any subsequent time before a complete entry of the lands by Miles. This was what the board did on the 7th of July, on being informed and made to apprehend that the work reported on in township 15 south, range 1 east, was insufficient to justify the allowance made for it; and the suspension of the application of Miles, and the cancellation of his scrip, were made final by the orders of the board of the 4th of October, 1851, and of the 6th of January, 1853, after provision had been made by the board for notice of its action to be given to Miles, and when, as upon the making of the last order, Miles was before the board. And the question is not, whether the board acted with leniency towards Miles, or with discretion, or even with proper regard to his legal rights; but it is, what they did, and whether they acted within the scope of their official authority. They were empowered by law to sell the lands for levee work, to determine the extent and dimensions of the necessary levees, and when under a contract, new work was to be made, or old work to be received, they constituted the tribunal, the exclusive tribunal, for deciding when the work tendered should be received. *Gaines vs. Hale*, 16 *Ark.* 25. And not being shut out from enquiry into the fact whether work ought to be paid for, though its estimates had been sanctioned by them, and finding at their sitting of 4th October, 1852, on testimony, that the levee work of Miles, in township 15 south, range 1 east, was insufficient in not conforming to their prescribed lists of levees, their rejection of the work was within

the lawful exercise of their authority; and whether the evidence which was brought before them justified their action, is not material to say, as we do not sit to correct the errors of the Board of Swamp land Commissioners. 2 *Land Laws, Instructions and Opinions,* (*Ed. of* 1838,) 85; *Wilcox vs. Jackson,* 13 *Pet.* 511. And whether the board were acting judicially upon testimony, or ministerially upon their own knowledge, and the best information they could obtain, will not affect this conclusion.

It was said, by the counsel for Underhill, in *Hempstead vs. Underhill,* 20 *Ark.* 343, that the duty of the commissioners in regard to certifying entries made before them, was "to ascertain that the " State was indebted to the contractor for work done; to receive " his application for land in payment, and if it was swamp land, " and there was no prior application, to certify that he had ap- " plied to purchase it, and had paid for it."

These are facts that must have been verified as existing facts when the certificate of purchase was to be signed by the commissioners. And if the commissioners, thinking that Miles had paid for lands in levee work, when his application to receive them in payment was entertained, should afterwards ascertain that the payment was fictitious, they could not certify that Miles had paid for the lands. And until Miles had received such a certificate, he had no evidence of an entry of the lands; till he had in fact made the payment in sufficient levee work, he he was not entitled to any such certificate. Indeed, Miles does not impugn the propriety of the action of the board, granting to it the power to act after the 10th of May, or after the 6th of July, 1852, the dates of his application for the land, and of the allowance by the board of the estimates of his work; but he objects that the subsequent suspending and rescinding orders of the board were nullities, vain attempts to cancel completed entries, destroy perfect titles.

If Miles had shown that the estimates of his work first allowed, were but the prescribed compensation for work satisfying the calls of his contract, and the requirements of the

ordinance of the board fixing the dimensions and quality of levees, he would have approached much nearer to showing a purchase of the lands, for it was only by payment of the lands that he would be entitled to a certificate of purchase. And though he had tendered insufficient work as payment, which had been received as such, that was no more to be considered as complying with his contract, than if, in buying land with scrip or money, he should effect an entry with base coin or counterfeit scrip. In either case, upon discovery of the mistake or fraud, the land officers, while the business was in their hands, might well treat the attempted entry as amounting to nothing. It was upon this principle, that instructions were given from the treasury department, in 1801, relative to receipts given in part payment of public lands: "The register is bound " by his duty not to grant certificates unless the money shall " have been actually paid according to the true construction of " the law, although you may have given receipts in full. And " supposing he had, through mistake, supposed himself obliged " to consider those receipts as binding upon him, most assuredly "·this department will not: and no patents shall issue, except " when the whole purchase money shall have been paid accord-" ing to law." And in a former part of the letter, it is written : " But a wrong construction heretofore given to the law, and " your having granted receipts in full on that wrong construc-" tion, although in conformity to your former instruction, cannot " alter the law itself." And in a circular to the registers, it is further said, on the same subject: " It is your special duty, before " you give to any purchaser either a certificate stating a partial " payment, and the balance due, or a final certificate of the pay-" ment being completed, to examine, yourself, whether the ac-" count, as stated by the receipt of the receiver, is correct." 2 *Opns. & Ins.* 224, *Nos.* 158, 159.

These instructions are imperative upon registers to disregard the recitals of payment made in receipts of receivers, unless upon their own investigation they found the recitals to be conformable to the facts ; snd they also state that it is erroneous for

either receiver or register to hold themselves bound by a receipt of full payment that should have been given only for partial payment. So, in *Cocrall vs. Safford*, 3 *How.* 461, the opinion of the court, after stating in general terms that lands which have been sold by receiving the purchase money and issuing a patent certificate, are no longer the property of the United States, but of the purchaser, and cannot be sold a second time, says that " where there has been fraud or mistake, the patent may be withheld :" and this we know to have been the practice of the land department, sanctioned by legal opinions and judicial decisions. And the department in such cases, only does what the subordinate officers ought to have done, but omitted to do, while the business was under their control, that is, to refuse to recognize as purchases, transactions that are founded in fraud or mistake. The allowance to Miles of pay for his work was evidently founded in mistake or fraud of the person who made favorable reports upon the work ; that is, the 'commissioners so thought when they made the suspending order of 7th July, 1852, when, on the 4th of October, 1852, they rescinded all approval of allowances before made to him, and when they finally refused, on the 6th of January 1853, to make any further order in the premises, leaving Miles and the conflicting claimant to their legal rights.

The whole argument for Miles, upon this branch of the case, consists in assuming that the lands were once sold to Miles, and could not therefore be sold away from him. The conclusion would inevitably follow from the assumption, but the latter not being well grounded, the former is, of course, unsound. Miles could not buy, could not acquire a valid claim to the lands without paying for them ; the work that was once received as pay was found to be insufficient work ; was therefore, no payment for the lands : that being so, his application for them was rightly disregarded, his scrip properly canceled. And we take the insufficiency of the work to be an established fact, because the Board of Commissioners so viewed it—not thinking it proper to go behind their action to see if it was well supported by

testimony, or by their own information. With that we have nothing to do; but have carefully examined the documents and depositions embodied in the record, and have a decided opinion of the way in which they ought to have affected the claim of Miles before the board; but that was for them, and is not for us to determine.

It was out of the power of the commissioners, if they had wished to do so, to make a transaction a sale, without actual payment for the lands. They could only sell the lands according to law; they could not give them away, or feign a sale, under the pretence of receiving as pay insufficient levees. Such is the principle heretofore applied by this court upon the naked power of sale by the commissioners. *Deloach vs. Brownfield*, 22 *Ark.*, 348. See also *Wynn vs. Garland*, 16 *Ark.*, 461.

The certificate of Miles' application, and his acts in relation to the lands, seem both by the commissioners and in the record of the two cases before us to have sometimes been denominated entries; and the argument for him is persistent in bestowing that appellation; but we hold that he never entered the lands. Even if Miles had received a certificate of the purchase of the lands, but without paying for them, his cause would have been no better, although the argument for him might have been more pertinent.

By the estimates, Miles seems to have done levee work in two townships, and though, in July, 1852, the allowance of the estimates for work done in township 15 South, Range 1 West, was suspended, yet, in October, 1852, when the board took the matter into final consideration, it was only the report of the levee work in Township 15 South, Range 1 East, that was rejected, with the entries made by Miles in that township. The attempted entries of Miles were all in that township, so far as they are to be considered in this case, and it is strongly urged that the unfavorable action of the commissioners was highly oppressive and illegal, in disallowing the application of Miles as to all the lands in the last named township, when the work done in Township 15 South, Range 1 West, which amounted to two

thousand, four hundred and fifty-nine dollars and eighty-nine cents, was not condemned by the board as insufficient. Although no formal order from the minutes of the board rejecting the work in this township appears in the record, yet from the report of Bailey, a sub-commissioner, this work would seem to be resting under the suspicion thrown upon it by the suspension of its estimates made in July, 1852; for, in July, 1853, he reports that he had measured and examined it under the direction of Trousdale, one of the commissioners, and recommended the rejection of the several parcels of work in that township, which would seem to be all that Miles had done therein, for insufficiencies in the quality of the work, that are specified in the report. Bailey's report also shows that Miles had been allowed for seven thousand, eight hundred and twenty-one yards more than he was entitled to by Bailey's measurement of the work. This alone would deduct fifteen hundred and sixty-four dollars from the estimates of that township, and taking into consideration that all the levees in this township, but one of eight hundred and fifty-nine feet in length, were made around trees and stumps, contrary to the ordinance of the board, Miles would not have reason to complain that a large amount of dues to him were retained in the swamp land fund. The report of Bailey is endorsed : "Rejected, and all applications for lands to be null and void. J. W. Buckner, Swamp Land Commissioner." The rejection evidently referring to the work that the report recommended to be rejected. But whether the work in this township was, or not, formally rejected by the board, by its express order Miles was prevented from enjoying the avails of it, in the rejection of his application, and in the cancellation of the scrip, and whether they acted wisely or legally is not for us to say. If Miles was entitled to pay for the work in Township 15 South, Range 1 West, and he only wished to have the amount due to him, without contending for the lands, after Smith, the land agent, refused to give him the patent certificate, he could have called for a refunding certificate, under the 5th section of the act of 20th January, 1855, through which he

might have obtained what was his due : or, adopting the course of the court in *Galloway vs. Finley,* 12 *Pet.* 297, which left it to an unsuccessful claimant of land to "secure the benefit of his warrants," used in the entry of the lands, as he could, we may leave it to Miles to settle as he can with the proper authorities relative to the estimates of the levee work in Township 15 South, Range 1 West.

We have considered the claim of Miles, without regard to the adverse claim of Walworth, for that of Miles being prior in time, could not have been affected by the entries of Walworth, if it had been superior in law. And any equitable circumstances that attach to the claims from a consideration of the relations between the parties belong to another head of the case. Neither has any mention been made of the contest of Miles and Walworth before the land agent, in 1858, as we understand the position of Miles to have been fixed by the action of the commissioners upon his dealing with them, and that his rights could not have been destroyed by an adverse decision of the land agent, if he had been entitled to the lands. In the conflict between him and Walworth, the decision of the land agent in favor of the latter, would indicate him as the one to receive a deed from the governor; but if the right of Miles was better than the claim of Walworth, the deed would only confer the legal title upon Walworth, charged in equity with holding it in trust for the benefit of Miles. This is in accordance with the opinion of this court in a case which seems to be misapplied by the counsel of both parties in this case. For, in that case, this court expressly held that the 5th section of the act of 20th January, 1855, did not confer any judicial power on the land agent to determine upon the validity of the conflicting claims presented to him, and said: "On the contrary, it merely "confers upon the land agent ministerial power to inquire into "the facts in relation to conflicting entries, and to give the pa- "tent certificate to the party appearing to be entitled to it by "law. But his decision is not conclusive upon the rights of the "parties. The party to whom he issues the patent certificate

" may obtain the deed of the governor for the land ; but the party
" holding the conflicting certificate, is not bound to surrender it,
" and take a refunding certificate.   He may stand upon his rights,
" notwithstanding the decision of the land agent against his
" claim, and when the deed is issued to the successful claimant,
" may file a bill in equity to divest his title."   *Hempstead vs. Underhill*, 20 *Ark.* 358.

This shows that the finding of the land agent could not be
" necessarily conclusive, and not subject to review except for
fraud or unfairness by bill in equity," as argued for Walworth :
nor do we see the force of the argument of the counsel for
Miles, who impugns *Hempstead vs. Underhill*, because it upheld
a statute that required a final certificate of purchase to be submitted to the land agent for a patent certificate, instead of the
direct submission to the governor, allowed under the act of
1851. For, if there were conflicting certificates for the same
land submitted to the governor, he would have to determine on
which certificate he would issue a deed ; and in so doing, would
act as a ministerial officer. The act of 1855 only relieved the
governor from the burden of the act of 1851, in making the
land agent to act ministerially in deciding to which of conflicting claimants for the same land the deed should be given, and
did not impose any new burden upon the holder of a certificate of purchase from the commissioners, that conflicted with
another certificate ; it only shifting the burden and responsibility
of the same ministerial act to another ministerial agent. The
act of 1855 was designed to afford a remedy for irregularities
which had fastened upon entries made before the commissioners,
and attached the duty of deciding between conflicting entries, to
the person who, in having the books and papers evidencing the
entries, had the best means of investigation necessary to an intelligent decision.

On this branch of the case, we therefore hold, that Miles did
not obtain any right to the lands by his application to enter
them, nor by the certificate given him of such application for
levee work received by the Board of Commissioners ; that he

did not enter the lands, did not buy them, did not pay for them, and that on account of his naked claim to the lands he cannot be heard in a court of equity, to abate the amount of an admitted debt to Walworth, by the value of the lands, by the sum that under his application for the lands he proposed to pay for them, nor in any other sum, unless from some fact yet to be considered, Walworth's mortgage debt against Miles ought to be affected by the attempted entry of the lands by Miles.

Although the greater part of the record of the two cases before the court consists of documents and testimony relative to the attempted entries of Miles, and to the entries of Walworth, yet the title to the lands is not directly in controversy. Walworth settled upon Point Chicot, in 1828; in 1836, he extended his possessions by buying the improvements of another settler, and from these times till Miles attempted his entry of 10th May, 1852, Walworth was the occupant of the lands, using them as his own, and doubtless expecting at some day to obtain title to them from the United States. But the De Villemont claim had been overshadowing these lands, with others that Miles was holding, for nearly half a century, on account of which the general government had not exposed them for sale. But this claim was finally held to be worthless by the Supreme Court of the United States, at its December term, 1851, 13 *How.* 261, when the lands covered by it fell to the State under the swamp land grant. Miles, on the 10th of May, 1852, and while Walworth maintains that he was absent for the purpose of defending the possessions of himself and of Miles from the De Villemont claim, endeavored to appropriate to himself the lands, so long and so exclusively occupied and enjoyed by Walworth. But, by the 18th of May, Walworth had returned home, had been informed of the action of Miles, and had expostulated against it, as may be inferred from the following writing:

" POINT CHICOT, May 18th, 1852.

" I agree with Colonel Walworth, to submit to Colonel E.
" Worthington and Major William McD. Pettit, the question,
" whether I was justifiable in entering, and am justifiable in

" holding (under existing circumstances,) certain lands held and " claimed by said Walworth. The part claimed by me being " all said lands said Walworth cannot hold by pre-emption or " cultivation. I agree, if said decision is against me, to take " the market value of my scrip (located on said lands) at Hele- "" na, on the first day of June next. It is agreed that if said " Worthington and Pettit cannot agree, they are to call in any " third person whom they may agree upon.

JAMES B. MILES."

On the 20th of May, 1852, the persons named in the foregoing writing reported this award:

" The undersigned deem it not commendable nor justifiable that " one neighbor should take possession of the plantation or pre- " mises of another. We are willing to pay taxes for the support " of government, that we may be protected in the security of " our property, and the safety of our persons; for these alone " are laws instituted, but if upon the happening of any extraor- " dinary circumstances, not contemplated by the makers of laws, " and therefore not condemned by law, one of us is enabled to " take possession of the property of another, it is as morally " wrong, and would be as legally wrong, as any other offence " known to the laws. Therefore, the undersigned believe that " Mr. J. B. Miles should not wish to hold the lands located by " him, belonging, or supposed to belong to Col. Walworth. The " undersigned would also suggest, that Col. Walworth pay to Mr. " J. B. Miles one dollar and twenty-five cents per acre for all the " lands located by him, belonging to Col. Walworth. The under- " signed would furthermore recommend Col. Walworth to give " Mr. J. B. Miles, on the score of liberality, one year's extension " of time upon the debt wherein he has confessed judgment. " May 20th, 1852.

E. WORTHINGTON.

WM. McD. PETTIT."

But upon the same date of the award, Miles wrote to the arbitrators the following letter, which purports to be written before Miles had been informed of the award:

" MILESEA, May 20th, 1862.

" Messrs. WORTHINGTON and PETTIT—

" *Gents:* I have considered the matter submitted to you " for arbitration, between Col. Walworth and myself, and have " concluded that inasmuch as I do not consider that I have any " thing to gain by your decision, even if decided favorably to " me (he, Col. Walworth, making no concession in such an " event), but all to lose, and that the reasons I claim for my jus- " tification in the premises not.being properly known or under- " stood by you, and the unjust influences brought to bear upon " me, in influencing me to submit to your arbitration, are known " only to myself, I decline abiding any decision made in the matter.

" Yours, etc.,

" JAMES B. MILES."

The next step taken by the parties, was an agreement that was made between them at New Orleans, on the 25th of May, 1852, which is also here copied:

" Articles of agreement, made the 25th day of May, 1852, " between James B. Miles and H. F. Walworth, (both of Chicot " county, State of Arkansas,) witnesseth: That whereas the " said James B. Miles has entered certain lands in said county " of Chicot, State aforesaid, being the plantation and lands " adjoining thereto, occupied and cultivated by said Walworth, " and described as follows: all the lands north and east of the " fence which now divides the fields of said Miles and Wal- " worth, including the lands known as the Boon's place; pro- " vided the said Walworth makes a satisfactory arrangement " with Boon's heirs. The dividing fence, before spoken of, is to " be continued on the line extending from the river, back to " Long Pond, crossing it, to a gate on the line between the " parties, west of said pond, thence to a box-elder or hackberry " (not now remembered,) marked by J. H. Hunneontts and J. " H. Calloway, and thence to continue to the river above, in " the same direction that the tree is from the gate. Said Miles " binds himself to relinquish all said land to said Walworth by

" a sufficient deed, at one dollar and twenty-five cents per
" acre for the scrip used in locating the same, and as soon
" as the quantity is ascertained, said Walworth agrees to pay for
" the same at said rate, by entering a credit for the amount
" thereof on a judgment confessed by said Miles in favor of
" said Walworth, for fifteen thousand dollars, besides interest
" and cost, before Samuel W. Cooper, clerk of the Circuit Court
" of Chicot county, Arkansas, on the 13th day of March, 1852,
" and for the residue of said judgment, said Walworth agrees
" to extend the time of payment as follows: one-fourth thereof
" to be paid 1st February, 1853; one-fourth 1st February, 1854;
" one-fourth 1st February, 1855 ; and the remaining fourth 1st
" February, 1856. And it is further agreed that if the said
" Miles shall fail to make any one of the payments, or any part
" of any one of them at the time the same may be payable,
" the said Walworth, his heirs, executors or administrators,
" may without bill to foreclose, proceed to sell to the highest
" bidder, for cash, so much of the property, real or personal,
" mortgaged to secure the debt for which said judgment is con-
" fessed, as will be necessary to satisfy the same so unpaid,
" giving ninety days previous notice of such sale, by advertis-
" ing the same at court-house door of said county of Chicot.
" In witness whereof, the parties hereto have set their hands and
" seals, this 25th day of May, 1852.

" JAMES B. MILES,    [seal.]<br>
" H. F. WALWORTH,  [seal.]."

It seems to be admitted by the parties, and the court below
found, that the lands embraced within the lines stated in the
agreement, would measure about thirty-seven hundred acres,
which would make a credit for Miles, on his mortgage debt to ·
Walworth, of about forty-six hundred and twenty-five dollars.

By the 31st of May, 1852, Walworth was in Helena, endeav-
oring to ascertain at the swamp land office the facts concerning
the alleged entries of Miles. He then was informed that Miles
had entered about twenty-five hundred acres of the lands, but
obtained a certificate from the person in charge of · the office

that about eighteen hundred and twenty acres of the land which Miles claimed to have entered, and which was included in the New Orleans agreement, were not located, or reported to the office. Walworth, according to the testimony of Hornor, then applied for and entered these lands, which he was informed that Miles had not entered; although the record shows that the entry was made the day after Walworth obtained a certificate from the office, of the lands that had been, and had not been entered by Miles. Proceeding further in his researches, Walworth was advised that an allowance had been made to Miles for a levee in township 15 south, range 1 east, and upon the same day of his own purchase of the eighteen hundred and twenty acres, he signed a paper that is called through these proceedings, a protest, in which he claimed that the levee was not a sufficient one under the rule of the commissioners, and that the levee was partly made by himself, and that his interest in it was still existing. The paper, though of date of 1st June, 1852, does not appear to have been presented to the board of commissioners till the 7th of July, 1852, during a regular meeting of the board, and when presented, it was the foundation, or at least it preceded the action of the board upon the estimates, and application and scrip of Miles, that ended so disastrously for him, as has been set forth in a former part of this opinion. After the order of the board of 7th July, 1852, suspending the application of Miles, Walworth, having been informed of it, wrote to Hornor, which fact, with its results, is thus stated in Hornor's deposition: "Afterwards, to-wit: on the " 12th of July, 1852, Col. Walworth wrote to me from Louis- " ville, stating that he was informed the Board of Swamp Land " Commissioners had suspended the entry of Mr. Miles, and " being anxious to prevent any other person from entering said " lands, in the event Mr. Miles' entry being rejected and set " aside, he requested me to enter in his name the same lands " that had been entered by Mr. Miles, if the secretary could " permit such an entry. I accordingly went to the swamp land " office, and made the application, which was granted, and did.

43

" then enter in the name of Horace F. Walworth, 2,503 84-100
" acres of land, being the same and only lands, as I under-
" stand from the secretary, that had been entered by Mr. Miles.
" Judge Butts, the secretary, made a note at the bottom of
" the certificate he granted to me for Col. Walworth, that the
" lands embraced therein had been previously entered by James
" B. Miles, but that his entry was suspended by an order of the
" Board of Swamp Land Commissioners." In due course of
time Walworth appeared before the Board of Commissioners
at their regular meetings in October, 1852, and in January,
1853, and if he did not procure, he at least urged the board to
make their orders of 4th October, 1852, and of 6th January,
1853. So, in May, 1858, when both Miles and Walworth ap-
peared before the land agent, the latter contested the right of
Miles to a patent certificate, obtained one certifying to his own
entries, and upon them procured deeds from the Governor, by
which, on the 1st of March, 1859, he acquired a perfect legal ti-
tle to the lands.

These acts of Walworth relating to the claim of Miles, and in
urging his own claims from their first inception in June, 1852, by
his successful application for eighteen hundred and twenty acres
of the lands, and by his eventual successful protest against the
allowance to Miles for the levee in township 15 south, range 1
east, to obtaining the patents for all the lands in March, 1859,
show what response should be made to his offers to perform spe-
cifically the New Orleans agreement, by allowing to Miles the
credit of forty-six hundred dollars, if he could not do better by
relying upon his own title.

Since Walworth discovered that Miles had not entered all
the lands embraced in the New Orleans agreement, he has done
no act in recognition of the agreement, but with persistence,
vigor and success, he has done all that could be done to de-
stroy the claim of Miles, lest he might have to give to Miles the
credit for the lands provided for in the agreement, and to
strengthen and establish his own claims to the lands so as to
hold them by his own title independent of the agreement. No

specific performance of the agreement could then be decreed at the request, or upon the consent of Walworth.

But before determining the remaining point in the case, whether a specific performance of the New Orleans agreement, shall not be enforced against Walworth, for the purpose of allowing to Miles the credit upon his mortgage debt, that the price of the lands provided for in the agreement would produce, it may be well to detail with more particularity than has been observed the manner in which the question of the credit has been raised. This will also explain why it has been necessary in this opinion, as well as incumbent upon the parties to the controvery, to examine the claim of Miles to the lands, although its validity was but incidentally involved, there being no prayer on the part of Miles that it should be decreed to be valid, or superior to the title of Walworth; and none on the part of Walworth that it should be canceled, or that Miles should be enjoined from setting it up to the prejudice of Walworth.

In January, 1848, Miles executed to Walworth a bond, which contained an acknowledgment of indebtedness in the sum of fifteen thousand dollars, payable in installments, the last of which was to be due the 1st of February, 1852. A mortgage of even date with the bond, was also given to secure the payment of the money. On the 13th of March, 1852, Miles confessed judgment before the clerk of the Circuit Court of Chicot county in the sum then due. This is the debt that is referred to in the award of the arbitrators, upon which they recommended Walworth to give Miles a further credit of a year; and the same that is mentioned in the New Orleans agreement, wherein Walworth agreed to receive the remainder of the debt not satisfied by the price of the lands in four equal annual payments, beginning with 1st February, 1853, and ending on the 1st February, 1856. But after Walworth was informed at Helena, at the swamp land office, that Miles had not entered all the lands of which Walworth was in possession, and was himself permitted to purchase a portion of them on the 1st of June, 1852, and especially after he had procured the application of Miles for all

of the lands to be suspended, and was permitted to enter them in his own name, he did not depend upon Miles for a title to the lands, nor for his enjoyment of them, nor did he regard the agreement as binding in its stipulation to extend credit to Miles upon the judgment taken by confession. Walworth, therefore, filed a bill on the chancery side of the Circuit Court of Chicot county, on the 20th of February, 1855, for a sale of the mortgaged property, and for a decree for the mortgage debt. At the same time he procured an execution upon the confessed judgment, which was levied on property of Miles.

On the 26th of March, 1855, Miles filed in the same court a bill against Walworth, claiming two credits of $4,650, each, to be applied respectively the 15th of December, 1852, and in November and December, 1853, as having been paid to Walworth, through Wright, Williams & Co., of New Orleans. Miles also set up his alleged entry of the Walworth lands, the New Orleans agreement, and by virtue thereof claimed a further credit against the mortgage debt. These credits, he claimed, would so reduce the debt that nothing would be due, except what, under the agreement, would fall under the last installment to be paid the 1st of February, 1856; whence he asked injunction against the execution and for a stay of the suit of foreclosure.

On the 10th of April, 1855, Miles filed an answer to the bill of Walworth, in which he relies for a defence upon the same matters that were contained in his own injunction bill, and made his answer a cross-bill. In both suits Miles charges that Walworth, with fraudulent intentions, attempted to set aside the title of Miles to the lands, which Walworth had purchased of him by the agreement.

Walworth also made his answer to the injunction bill of Miles a cross-bill, and resisted the allowance to Miles of the credit for the lands, on the ground that Miles had not entered them as he had alleged and undertaken he had, by the agreement; that he fraudulently concealed the facts from Walworth,

intending to deceive and injure him by obtaining pay for lands, a part of which he had not entered at all, the remaining part being taken up by Miles in fraud of the rights of the State, and in violation of the acts of the General Assembly, or of the ordinances of the board of Swamp Land Commissioners; that the alleged entries of Miles had been canceled, and that he could not perform his part of the agreement by giving title to the lands.

From this statement of the case, it will be seen how the validity of the alleged location of the Walworth lands by Miles was brought into controversy, for if the lands were well located by Miles, under the New Orleans agreement he was entitled to a credit for them of one dollar and a quarter per acre upon his mortgage debt to Walworth. And on the other hand, if Miles never located or entered the lands, he ought not to have the credit, unless Walworth wrongfully interfered to frustrate his efforts to obtain a title to the lands.

A review of the acts of Walworth has shown that, from the 31st of May, 1852, he entirely disregarded the agreement, and it now remains to be seen whether Miles respected the agreement so as to be heard to ask for its specific performance. For if it be found that he, as well as Walworth, repudiated the agreement, that will dispose of his prayer for its execution. If it be found that his actions have been consistent with the agreement; that since its date he has recognized its obligations, then it may be necessary to recur to facts that were antecedent to the agreement, to determine from them whether it be such an agreement, and executed under such circumstances, as will require a court of equity to uphold it, and decree its specific performance for Miles against Walworth, by allowing to the former the credit so often mentioned.

In a former part of this opinion it has been stated that Miles, on the 6th of January, 1853, appeared before the Board of Commissioners, and protested against its action upon the sufficiency of his levee work, and upon his alleged entries made on account of the work. Walworth was also before the board at

the same time protesting against the work, asking for its examination by a suitable engineer, and claiming not to be disturbed in his claim to the lands, which, he alleged, he had been permitted to enter, after the previous cancellation of the entry of Miles.

At that time, Miles must have known that Walworth was disavowing the agreement. But, before this, he had been informed by Wright, Williams & Co., that Walworth was not depending upon the agreement, but would endeavor to make his money under the judgment of confession; for in a letter to this firm, under date of 5th November, 1852, he says: " You wrote " me that Col. W. had written to you that he would proceed " under his judgment to make his money. He has been to " Helena and done something, I do not know exactly what, and " I do not believe he does himself; but I do not apprehend that " he can do me much damage. I suppose he will issue his exe- " cution next February, but I shall get an injunction, and it will " probably be some year or more before he will get his money." Under date of 14th January, 1853, he writes to the same: " I should be very much obliged to you, if you would send me " either a letter of credit to draw on you for $3,975, or send me " the gold, as I wish to tender it to Col. Walworth, on the first " day of February next. I have no idea that he will accept it. " He wishes now to bind me to the old contract, and he has " violated it, and I consider that I am relieved from all moral " obligation to him, and shall, therefore, make all I can out " of it. I have offered to take $25,000, and if he pays me " before it commences in law, it will settle the matter. But I " think he will hold off, thinking I will take less. Please " preserve his letters, as it may be of use as evidence, although " I have sufficient, I think, without it. He now claims that he " has done nothing to break the contract. I see Col. W. has " got Point Chicot advertised in the Picayune. I expect it " it would be a good plan for me to insert an advertisement under " it, saying that I claim it, and forewarn all persons from pur- " chasing. If you think it will do me any good, you will please

"have it inserted.  You will please pay for it, and at the same
"time pay my subscription for the year.  I enclose an adver-
"tisement which you will please insert twice a week, in daily
"and weekly, until March 1st.  Have it done immediately, as
"February 1st is close by.  Tell them to insert it under Col. W's
"advertisement.  I think I can pay some of my debts off of Point
"Chicot yet.  I have been advised to insert the above by my
"lawyers."

The advertisement above alluded to reads thus :

"NOTICE.—Whereas, H. F. Walworth has advertised Point
"Chicot for sale, this is to let all persons designing to purchase
"know that I claim the whole of said Point Chicot by right of
"location in the swamp land office, Helena, Ark., and any one
"purchasing the same will do it at their own risk.

"JAMES B. MILES.

"January 23d, 1853—w. & d."

A note was also added over the initials "J. B. M." Columbia,
Ark., directing other papers to copy the advertisement.

On the 13th of February, 1853, Miles writes again:  "Col.
"Walworth is acting a little singularly : at one time he thought
"he had the advantage of me, and did not care for our New
"Orleans contract : then he went to Helena and was told a dif-
"ferent story, and he then said he should hold me by the contract,
"and now he seems to think he has got the advantage again,
"and does not wish to hold me by it.  If he is satisfied, it is all
"right, as I do not wish to go by the contract, and if he cannot
"hold me to it, I am bound to have at least 2,500 to 3,000 acres
"of his land, and as the thing is now, I shall get every acre of
"it, and if I do get it at the end of the law, he shall never have
"it."  And in a letter of the 8th of March, 1853, Miles thus
expresses himself :  "As to Col W.'s and myself's difficul-
"ty, I do not suppose it can be settled except at the end of the
"law.  He thinks he can get clear of the whole concern ; but
"I think not.  I would not settle with him now for less than
"$25,000, and 1,200 acres of land.  He seems inclined to
"fight the matter through, and I shall try him any how.  I

"can get men to take the responsibility of the costs for a propor-
"tion of the amount to be made off it. He thinks he has got all
"of my locations upset; but that is all a notion."

From these letters, and from the advertisement of Miles, no
inference of any other intention can be drawn than that which
is emphatically expressed: that Miles was contented with Wal-
worth's disregard of the agreement, that he did not intend to
enforce it against Walworth, and that he would be a great
gainer by the adoption of this line of conduct. If Miles had
wished, or had intended to perform his part of the agreement,
he would not have endeavored by the assertion of a hostile title
to hinder Walworth from making the sale that his advertise-
ment in the New Orleans Picayune offered. For in such a
case it was immaterial to Miles what Walworth should do with
the lands, and whether he kept them, or exposed them to sale,
Miles had no right, while standing upon his agreement, to
obstruct Walworth in their use, or to interfere in any disposi-
tion of them he might propose. His interest in them only
concerned the credit for them upon his mortgage debt, and
his legal obligation was to be ready, if necessary, to assist in
any transfer of the lands Walworth might make, by giving to
his representatives, which would include purchasers, such deed
as by the agreement he was to make to Walworth himself.
The expressions used in the letters to Wright, Williams & Co.,
might not perhaps be sufficient for Walworth to show that
Miles abandoned the agreement because he might not, to Wal-
worth, claim the exoneration from the agreement that he
rejoiced in by his letters to other persons; but the position taken
by him in his published notice was a proclamation to Walworth,
as well as to the world beside, that his claim was hostile and
paramount to that of Walworth. That notice alone is suffi-
cient to deprive him from any benefit of the agreement; the
letters can only be used in support of the conclusion, as showing
the same intention, as that which the notice itself suffi-
ciently manifested. The letters and notice certainly show, on
the part of Miles, an acceptance of Walworth's rejection of the

agreement. Neither one, nor the other can say but that they have both annulled the agreement as much as if by mutual assent they had agreed to waive its provisions, and to be and to act as if it never had been made. And in such a case, the agreement could not have been performed. *Willards Equity Jurisprudence* 202; *Baldwin vs. Salter*, 8 *Paige* 475.

Walworth's repudiation of the agreement may have been sufficient ground for Miles to disregard it, and endeavor to make the most of his speculation of locating the Walworth lands, but after what Miles has done, it is idle for him to ask for an enforcement of the agreement, by giving to him the benefit, in this controversy, of the forty-six hundred and twenty-five dollars, which would be the price of the lands included in the agreement. And so Miles seems to have been advised in an advanced period of the litigation, for in March, 1857, he filed a pleading, in which he stated, that "owing to a change of his " condition, and situation of his affairs, he is now willing and " consents that the prayer of the said Walworth, whereby he " prays that the agreement or contract copied into his answer " to the original bill of complaint and made part thereof, be " canceled and held for naught, be granted in order to end con- " troversy, and all further litigation ; but only on the following " express and equitable conditions : that he, the said respondent " shall be placed by this honorable court, in regard to the said " agreement, in the same condition to all intents and purposes " as if the same had never existed, or in the condition in which " he was before the said agreement was made, and without ". any prejudice to his rights as they existed anterior to that " time."

Although Walworth might consider the conditions of the consent thus expressed, to be high sounding and unnecessary, they were very harmless, because Walworth, by his own dissolution of the agreement, had absolved Miles from any obligation imposed by it, and had thereby put him in the condition in which he was before the agreement. Just a year afterwards, Walworth filed an amendment to his original bill, seemingly to

avoid some unknown but anticipated effect of the new position of Miles, by which it is suggested to the court that Walworth's wish was to have the agreement canceled, if it should hold that Miles obtained no title by his location, but if the court thought otherwise, Walworth was willing to allow Miles credit for the lands, and that Walworth intended no more by his former pleadings. Upon this, the counsel for Miles has justly commented, but it was only pursuing the same course that had before been taken by Miles in first insisting on, and then in forsaking the agreement. It is enough to say upon these proceedings, that they are an apt representation of the inconsistencies and confusion that were triumphant throughout the case, as shown by the transcripts of them filed in this court.

The result which has been reached from an observation of the course of conduct taken by the parties to the agreement with reference to it, or rather in spite of it, relieves us from the disagreeable task of determining on the inefficiency of the agreement, which the counsel of Walworth allege against it, from its want of consideration on his part, and from the unfair conduct of Miles with relation to Walworth's possessions, which induced Walworth to enter into the agreement. Yet, as supplementary to another part of this opinion, which announced that the legality of the location of Miles must be determined without regard to the possession of Walworth, we will not refrain from remarking that a different principle might be applied, when Miles, after having established a legal right, should make it the ground of equitable relief. It is very clear that, as the action of Miles in his alleged entry did not commend itself to Mooney, when Miles was obtaining the numbers of Walworth's plantation to make his entry, nor to Worthington and Pettit, the arbitrators, so it could not but seriously affect him in a court of chancery; not to deprive him of a legal defence, but in keeping back the active interposition of the court for him as a plaintiff, or as a defendant, in avoidance of a just complaint against him.

Walworth, on the other hand, could not regard the act of

Miles in attempting to enter his occupany, with complacency: necessity would only compel him to recognize the claim of Miles, and when he discovered that the claim was not well founded in extent, and in character, nothing else could have been expected of him than to object that the agreement which bound him to pay for the claim, was without consideration. It would be a grievous mistake to consider him as a purchaser in the first instance from Miles, and put into possession of the lands by him. Then he would have been subject to the application of the principle of *Galloway vs. Finley*, 12 *Pet.* 264, and of *Pintard vs. Goodloe*, 12 *How.* 24, but in his actual position these cases do not affect him.

At the time of the hearing of these causes in the court below, the right of Miles to a credit of payments to Walworth, through Wright, Williams & Co., was not contested. When Walworth filed his original bill, a part of the mortgage debt had been assigned to Wright, Williams & Co., for moneys which they advanced to Walworth for Miles, but in the dealings of the latter with the firm he became entitled to credit for these sums. The court below deducted them at the proper dates from the mortgage debt and so far its decree was right. But because the Circuit Court of Chicot county, sitting in chancery, held the attempted location and entry of Miles to be valid, investing him with the title to the Walworth lands, and that by virtue of the New Orleans agreement, Miles should have credit on the mortgage debt for the price of the lands included within the lines mentioned in the agreement, its decree is reversed; and we direct that a decree be entered in this court conformably to this opinion.

The clerk of this court is appointed special master in chancery, to ascertain the sum due upon the mortgage debt. The decree will be made in the original suit of Walworth, the injunction bill of Miles and his cross-bill in the first suit being dismissed. As the two causes have been consolidated here, but one decree for cost will be made, which will be that Miles shall pay

**684**    CASES IN THE SUPREME COURT

the costs of this court, and one-half of the costs in the court below, Walworth paying one-half of the costs in the Circuit Court, as unnecessary costs were there incurred on his part as well as by Miles.